## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT TRUMAN, derivatively on behalf of IROBOT CORPORATION,<br><br>     Plaintiff,<br><br>     vs.<br><br>COLIN M. ANGLE, ALISON DEAN, MOHAMAD ALI, MICHAEL BELL, RONALD CHWANG, DEBORAH G. ELLINGER, ELISHA FINNEY, RUEY-BIN KAO, ANDREW MILLER, and MICHELLE V. STACY,<br><br>     Defendants,<br><br>     and<br><br>IROBOT CORPORATION,<br><br>     Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

Plaintiff Robert Truman ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant iRobot Corporation ("iRobot" or the "Company"), files this Verified Shareholder Derivative Complaint against Colin M. Angle, Alison Dean, Mohamad Ali, Michael Bell, Ronald Chwang, Deborah G. Ellinger, Elisha Finney, Ruey-Bin Kao, Andrew Miller, and Michelle V. Stacy (collectively, the "Individual Defendants," and together with iRobot, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based

upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding iRobot, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by iRobot's directors and officers from November 21, 2016 through the present (the "Relevant Period").

2.      iRobot is a consumer robotics company that purports to design and build a variety of robots offering cleaning services, mapping and navigation solutions, and other functionalities. The Company's primary markets include Europe, the Middle East, and Africa ("EMEA"), North America, and Japan.

3.      iRobot sells its products through a network of international distributors. Historically, two of the Company's largest international distributors were Sales On Demand Corporation ("SODC"), and Robopolis SAS ("Robopolis"), which accounted for 12.9% and 12.3% of the Company's total revenue during the fiscal year ended December 31, 2016, respectively.

4.      Chief among the Company's product offerings is the Roomba vacuum cleaner robot. The Roomba, and its various iterations, are consistently the Company's best-selling products, and have in large part propelled the Company's revenue growth since the launch of the original Roomba in 2002.

5.     By all appearances, the Company seemed to maintain positive revenue growth during the Relevant Period, which the Individual Defendants consistently attributed to, among other things, increasing demand for the Company's Roomba products.

6.     In reality, the Company's revenue growth was not nearly as strong as the Individual Defendants' public representations made it out to be. Unbeknownst to the investing public, throughout the Relevant Period, the Individual Defendants caused the Company to engage in "channel-stuffing," in order to artificially inflate the Company's revenue and sales figures.

7.     Channel-stuffing is a deceptive business practice, whereby a company sends its distributors more product than those distributors could reasonably sell during a given time period. This allows the company engaging in the channel-stuffing scheme to record sales that would otherwise not have been booked until a subsequent reporting period.

8.     During the Relevant Period, the Individual Defendants caused the Company to "stuff the channels" of SODC and Robopolis. Moreover, in connection with this channel-stuffing scheme, the Individual Defendants caused the Company to acquire SODC's iRobot-related distribution business in November 2016, as well as the entirety of Robopolis in October 2017. By assuming direct control over two of the Company's largest distributors, the Individual Defendants were able to more effectively conceal and expedite the channel-stuffing scheme.

9.     The truth began to emerge on April 23, 2019, when the Company reported disappointing revenue figures, along with abnormally high inventory levels for the first fiscal quarter of 2019. On this news, the price of the Company's stock plummeted from $130.57 per share at the close of trading on April 23, 2019, to $100.42 per share at the close of trading on April 24, 2019, representing a decline of over 23%.

10.     The Company reported similarly concerning developments in its financial report issued on July 23, 2019, in which the Company's reported inventory levels continued to surge amidst stark reductions in the Company's full-year 2019 earnings forecast. Yet again, the price of the Company's stock dropped from $89.63 per share at the close of trading on July 23, 2019, to $74.51 per share at the close of trading on July 24, 2019, on heavy volume, a decline of nearly 17%.

11.     Finally, on October 22, 2019, the Company issued its financial results for the third fiscal quarter of 2019, which disclosed that the Company was cutting down its full-year earnings forecast even further, while attempting to blame the Company's disheartening reductions in growth on "suboptimal" customer response, in blatant contrast to the Individual Defendants' prior statements concerning demand for the Company's products. On this news, the price of iRobot shares dropped once more, from $54.03 per share at the close of trading on October 22, 2019, to $49.06 per share at the close of trading on October 23, 2019, a decline of over 9%.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in channel-stuffing, and by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, during the Relevant Period, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's

inventory levels would begin to increase substantially from quarter to quarter, contrary to certain of the Individual Defendants' representations; and (4) the Company failed to maintain internal controls.

13.     As a result of the foregoing, the Individual Defendants' and the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while nine of them engaged in lucrative insider sales, netting proceeds of over $36.6 million. Approximately 798,794 shares of the Company's common stock were repurchased during the Relevant Period for over $49.9 million. As the Company's stock was actually only worth $49.06 per share during that time, the price at closing on October 23, 2019, the Company overpaid by over $10.7 million in total.

16.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), and the Company's Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits, one pending in the United States District Court for the Southern District of New York, and the other pending

in the United States District Court for the District of Massachusetts (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, eight of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of their not being disinterested and/or independent directors, a majority of the iRobot Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of iRobot. Plaintiff has continuously held iRobot common stock at all relevant times. Plaintiff is a resident of Texas.

### Nominal Defendant iRobot

25.     iRobot is a Delaware corporation with its principal executive offices located at 8 Crosby Drive, Bedford, Massachusetts 01730. iRobot's shares trade on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "IRBT."

### Defendant Angle

26.     Defendant Colin M. Angle ("Angle") is a co-founder of the Company, and has served as the Company's President from 1992 through 1997, as CEO since 1997, and as Chairman of the Board since October 2008. According to the Company's Schedule 14A filed with the SEC on April 8, 2019 (the "2019 Proxy Statement"), as of March 8, 2019, Defendant Angle beneficially owned 561,993 shares of the Company's common stock, which represented 2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock

at the close of trading on March 8, 2019 was $122.20, Defendant Angle owned approximately $68.6 million worth of iRobot stock.

27.     For the fiscal year ended December 29, 2018, Defendant Angle received $5,683,314 in compensation from the Company. This included $742,308 in salary, $3,987,756 in stock awards, $945,000 in non-equity incentive plan compensation, and $8,250 in all other compensation.

28.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Angle made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/7/2017 | 9,857 | $63.41 | $625,032 |
| 4/3/2017 | 9,485 | $65.89 | $624,995 |
| 7/26/2017 | 5,886 | $106.20 | $625,104 |
| 12/26/2017 | 45,200 | $80.06 | $3,618,621 |
| 6/12/2018 | 13,334 | $75.00 | $1,000,050 |
| 7/6/2018 | 12,175 | $82.14 | $1,000,054 |
| 11/1/2018 | 11,117 | $89.96 | $1,000,085 |
| 11/28/2018 | 63,070 | $90.01 | $5,682,397 |
| 1/2/2019 | 24,739 | $80.85 | $2,000,006 |
| 1/7/2019 | 11,765 | $85.00 | $1,000,025 |
| 3/11/2019 | 16,272 | $122.52 | $1,995,813 |
| 6/3/2019 | 11,486 | $87.07 | $1,000,060 |

29.     Thus, in total, before the fraud was exposed, he sold 234,386 Company shares on inside information, for which he received over $20.1 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

30.     The Company's 2019 Proxy Statement stated the following about Defendant Angle:

**Colin M. Angle,** a co-founder of iRobot, has served as chairman of the board since October 2008, as chief executive officer since June 1997, and prior to that, as our president since November 1992. He has served as a director since October 1992. Mr. Angle previously worked at the National Aeronautical and Space Administration's Jet Propulsion Laboratory where he participated in the design of the behavior controlled rovers that led to Sojourner exploring Mars in 1997. He is a director of two private companies, Striiv, Inc. and Ixcela, Inc. Mr. Angle holds a B.S. in Electrical Engineering and an M.S. in Computer Science, both from MIT.

31.     Upon information and belief, Defendant Angle is a resident of Massachusetts.

**Defendant Dean**

32.     Defendant Alison Dean ("Dean") has served as the Company's Executive Vice President, CFO, treasurer, and principal accounting officer since April 2013. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Dean beneficially owned 66,043 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Dean owned approximately $8.07 million worth of iRobot stock.

33.     For the fiscal year ended December 29, 2018, Defendant Dean received $2,320,281 in compensation from the Company. This included $472,693 in salary, $1,360,538 in stock awards, $478,800 in non-equity incentive plan compensation, and $8,250 in all other compensation.

34.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Dean made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 4/7/2017 | 7,375 | $66.59 | $491,101 |
| 7/24/2017 | 17,646 | $90.00 | $1,588,140 |
| 9/12/2017 | 33,809 | $100.00 | $3,380,900 |
| 7/25/2018 | 16,778 | $85.00 | $1,426,130 |
| 9/24/2018 | 18,488 | $104.10 | $1,924,482 |
| 3/15/2019 | 23,625 | $126.12 | $2,979,654 |

35.　Thus, in total, before the fraud was exposed, she sold 117,721 Company shares on inside information, for which she received over $11.7 million. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

36.　The Company's 2019 Proxy Statement stated the following about Defendant Dean:

**Alison Dean** has served as our executive vice president, chief financial officer, treasurer and principal accounting officer since April 2013. Ms. Dean previously served as our senior vice president, corporate finance from February 2010 until March 2013. From March 2007 until February 2010, Ms. Dean served as our vice president, financial controls & analysis. From August 2005 until March 2007, Ms. Dean served as our vice president, financial planning & analysis. From 1995 to August 2005, Ms. Dean served in a number of positions at 3Com Corporation, including vice president and corporate controller from 2004 to 2005 and vice president of finance — worldwide sales from 2003 to 2004. She has also served as a director at Everbridge, Inc. since July 2018. Ms. Dean holds a B.A. in Business Economics from Brown University and an M.B.A. from Boston University.

37.　Upon information and belief, Defendant Dean is a resident of Massachusetts.

**<u>Defendant Ali</u>**

38.　Defendant Mohamad Ali ("Ali") has served as a Company director since August 2015. He also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Ali beneficially owned 11,791 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Ali owned approximately $1.44 million worth of iRobot stock.

39.　For the fiscal year ended December 29, 2018, Defendant Ali received $194,957 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $129,957 in stock awards.

40.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ali made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 7/13/2018 | 542 | $80.94 | $43,869 |
| 9/4/2018 | 743 | $111.10 | $82,547 |
| 6/10/2019 | 785 | $91.97 | $72,196 |
| 9/4/2019 | 780 | $61.11 | $47,663 |

41.     Thus, in total, before the fraud was exposed, he sold 2,850 Company shares on inside information, for which he received approximately $246,275. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.     The Company's 2019 Proxy Statement stated the following about Defendant Ali:

**Mohamad Ali** has served as a director since August 2015. He has served as the president, chief executive officer and director of Carbonite, Inc. from December 2014 to present. Mr. Ali has successfully led Carbonite's continued growth, serving the ever-evolving technology needs of small and midsize businesses and consumers. Boston-based Carbonite provides cloud and hybrid backup and recovery solutions for home and business. Previously, Mr. Ali served as chief strategy officer at Hewlett-Packard, a manufacturer of computers and enterprise products, from 2012 to 2014 and president of Avaya Global Services, an enterprise communications company. He also served in senior leadership roles at IBM Corporation, a multinational technology and consulting company, where he acquired numerous companies to build IBM's analytics and big data business. In addition to serving on the board of directors of Carbonite, Mr. Ali is also a director of Oxfam America and Massachusetts Technology Leadership Council and previously served on the Board of Directors of City National Corporation and City National Bank. He was named to Boston Business Journal's 2008 "40 Under 40" list, and recognized by Massachusetts High Tech magazine as a 2011 All-Star. Mr. Ali holds a B.S. and an M.S. in Electrical Engineering, both from Stanford University.

43.     Upon information and belief, Defendant Ali is a resident of Massachusetts.

**Defendant Bell**

44.     Defendant Michael Bell ("Bell") has served as a Company director March 2016. He also serves as the Chair of the Company's Compensation and Talent Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Bell beneficially owned 2,846 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Bell owned approximately $347,781 worth of iRobot stock.

45.     For the fiscal year ended December 29, 2018, Defendant Bell received $204,957 in compensation from the Company. This included $75,000 in fees earned or paid in cash and $129,957 in stock awards.

46.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bell made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 8/23/2018 | 4,355 | $105.22 | $458,235 |

47.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Bell:

**Michael Bell** has served as a director since March 2016. He has worked at Silver Spring Networks, Inc., Intel Corporation, Apple, Inc., and Palm, Inc. Mr. Bell was the chief executive officer and president of Silver Spring Networks, a leading networking platform and solutions provider for smart energy networks, since September 2015 until his retirement in January 2018. Previously, from 2010 to 2015 he held various roles at Intel Corporation, a multinational technology corporation specializing in the production of semiconductor chips, including Corporate Vice President New Devices Group, Corporate VP Mobile and Communications Group and Corporate Vice President Ultra Mobility Group. He was head of Product Development at Palm, Inc. from 2007 to 2010. He worked at

12

Apple, Inc. from 1991 to 2007 and played significant roles in development of Apple iPhone and Apple TV products, serving as Vice President, CPU Software from 2002 to 2007. He holds a B.S. in Mechanical Engineering from the University of Pennsylvania.

49.     Upon information and belief, Defendant Bell is a resident of California.

**Defendant Chwang**

50.     Defendant Ronald Chwang ("Chwang") served as a Company director from 1998 until he resigned on May 23, 2018.

51.     For the fiscal year ended December 29, 2018, Defendant Chwang received $45,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

52.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chwang made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 12/8/2016 | 10,000 | $59.25 | $592,480 |
| 5/2/2017 | 3,397 | $84.17 | $285,925 |
| 8/1/2017 | 3,243 | $106.32 | $344,786 |
| 8/29/2017 | 10,000 | $92.71 | $927,099 |

53.     Thus, in total, before the fraud was exposed, he sold 26,640 Company shares on inside information, for which he received over $2.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

54.     The Company's Schedule 14A filed with the SEC on April 10, 2018 (the "2018 Proxy Statement") stated the following about Defendant Chwang:

**Ronald Chwang, Ph.D.** has served as a director since November 1998 and brings extensive experience in technology, manufacturing, supply chain, business development and Asian operations. Since January 2005, he has been the chairman

and president of iD Ventures America, LLC (formerly known as Acer Technology Ventures, LLC) part of the iD SoftCapital Group, a venture investment and management consulting service group. He was the chief executive officer of Acer America from 1992 until 1997, growing it to over $1 Billion in revenues, and then became chairman and president of Acer Technology Ventures until 2004, managing high-tech venture investment activities in North America. Previously, he was president of two Acer business groups in Taiwan, from 1986 to 1991. Dr. Chwang holds a B.Eng. (with honors) in Electrical Engineering from McGill University and a Ph.D. in Electrical Engineering from the University of Southern California. Dr. Chwang will retire from the board following the expiration of his term at the 2018 annual meeting after nearly twenty years of service on our board.

55.    Upon information and belief, Defendant Chwang is a resident of California.

**Defendant Ellinger**

56.    Defendant Deborah G. Ellinger ("Ellinger") has served as a Company director since November 2011. She also serves as the Chair of the Company's Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Ellinger beneficially owned 16,858 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Ellinger owned approximately $2.06 million worth of iRobot stock.

57.    For the fiscal year ended December 29, 2018, Defendant Ellinger received $209,957 in compensation from the Company. This included $80,000 in fees earned or paid in cash and $129,957 in stock awards.

58.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ellinger made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 7/31/2017 | 7,082 | $105.21 | $745,119 |
| 8/21/2018 | 1,000 | $100.00 | $100,000 |
| 4/15/2019 | 2,000 | $130.00 | $260,000 |

59.     Thus, in total, before the fraud was exposed, she sold 10,082 Company shares on inside information, for which she received over $1.1 million. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

60.     The Company's 2019 Proxy Statement stated the following about Defendant Ellinger:

> **Deborah G. Ellinger** has served as a director since November 2011. Ms. Ellinger is also a director of Covetrus, Inc., a $4 billion tech-enabled veterinary services and supply company and is a senior advisor to the Boston Consulting Group. She was the president and CEO of Ideal Image, a chain of 130 medical spas providing non-surgical cosmetic procedures across the US and Canada, from 2016 until her retirement in March 2018; chairman and chief executive officer of The Princeton Review, a company which assists students globally in test preparation and tutoring, from 2012 to 2014; president of Restoration Hardware, a luxury home furnishings retailer, from 2008 to 2009; and chief executive officer of Wellness Pet Food, a natural pet-food company, from 2004 to 2008. Ms. Ellinger led each of those companies while they were owned by two private equity firms, and three of the four transitioned to new ownership, yielding three to seven times return on capital to investors. Previously, she served as an executive vice president at CVS Pharmacy, a senior vice president at Staples, and a partner at The Boston Consulting Group, and began her career with Mellon Financial Corporation. Ms. Ellinger also serves on the board of The Commonwealth Institute, a nonprofit, and is a former director of Interpublic Group, The Princeton Review, Sealy Corporation, National Life Group, and several other private companies. Her assignments have taken her all over the world; she has lived and worked in Europe, Asia, and America. Ms. Ellinger is qualified as a Barrister-at-Law in London, as a member of the Inner Temple. She holds an M.A. and B.A. in Law and Mathematics from the University of Cambridge, England.

61.     Upon information and belief, Defendant Ellinger is a resident of Florida.

**Defendant Finney**

62.     Defendant Elisha Finney ("Finney") has served as a Company director since January 2017. She also serves as a member of the Company's Audit Committee and Compensation and Talent Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Finney beneficially owned 3,273 shares of the Company's common stock. Given that the price per

share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Finney owned approximately $399,960 worth of iRobot stock.

63.     For the fiscal year ended December 29, 2018, Defendant Finney received $197,457 in compensation from the Company. This included $67,500 in fees earned or paid in cash and $129,957 in stock awards.

64.     The Company's 2019 Proxy Statement stated the following about Defendant Finney:

> **Elisha Finney** has served as a director since January 2017. Until her retirement in May 2017, she served as executive vice president and CFO of Varian Medical Systems since 1999, a leading developer of radiation oncology treatments and software, where she served in various management roles since 1988. Ms. Finney's management responsibilities included corporate accounting; corporate communications and investor relations; internal financial and compliance audit; risk management; tax and treasury, and information technology. She previously served as a board member at Altera Corporation from 2011 to December 2015, Thoratec Corporation from 2007 to 2013, and Laserscope from 2005 to 2006. She holds a B.A. in Risk Management and Insurance from the University of Georgia and an M.B.A. from Golden Gate University where she received the 1992 "Outstanding Graduate of the Masters Programs in Finance" Award. Ms. Finney was the 2015 UGA Terry College of Business Distinguished Alumni of the Year and the recipient of Silicon Valley Business Journal's 2013 "Women of Influence" Award.

65.     Upon information and belief, Defendant Finney is a resident of California.

**Defendant Kao**

66.     Defendant Ruey-Bin Kao ("Kao") has served as a Company director since June 2018. He also serves as a member of the Company's Audit Committee.

67.     For the fiscal year ended December 29, 2018, Defendant Kao received $245,788 in compensation from the Company. This included $25,822 in fees earned or paid in cash and $219,966 in stock awards.

68.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kao made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 7/8/2019 | 170 | $90.16 | $15,327 |

69.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

70.     The Company's 2019 Proxy Statement stated the following about Defendant Kao:

**Ruey-Bin Kao** was appointed to the iRobot Board of Directors in June 2018. He has more than 30 years of expertise in technology, telecommunication, corporate governance, and consumer business. Dr. Kao has held senior leadership roles, developing country growth strategy, driving revenue growth and profitability through enhanced customer and government engagements, and elevating corporate brand, at numerous global companies. From January 2014 to December 2017, he served as the Chief Executive Officer, Greater China, at Telstra Corporation Ltd., Australia's leading telecommunications and technology company. Previously, he served as Country President of Applied Materials China, the global leader in materials engineering solutions for semiconductor, flat panel display and solar photovoltaic industries, from 2011 to 2013; Managing Director and General Manager of Enterprise Business in China Hewlett-Packard Co. Ltd from 2010 to 2011; and China Chairman, president and several senior roles at Motorola from 1993 to 2010. Dr. Kao currently serves on the board of China National Travel Services Group Corporation Ltd., and was a former director of Shenhua Group Corporation Ltd. (now known as China Energy Investment Corporation Ltd.). Dr. Kao holds a bachelor degree in Computer Science from Tamkang University, master's degree in Computer and Information Science from the University of Delaware and a doctorate degree of Business Administration from the Hong Kong Polytechnic University.

71.     Upon information and belief, Defendant Kao is a resident of China.

**Defendant Miller**

72.     Defendant Andrew Miller ("Miller") has served as a Company director since September 2016. He also serves as the Chair of the Company's Audit Committee, and as a member

of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Miller beneficially owned 1,715 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Miller owned approximately $209,573 worth of iRobot stock.

73.     For the fiscal year ended December 29, 2018, Defendant Miller received $204,957 in compensation from the Company. This included $75,000 in fees earned or paid in cash and $129,957 in stock awards.

74.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Miller made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 12/27/2017 | 441 | $80.11 | $35,328 |
| 6/11/2018 | 636 | $69.41 | $44,144 |
| 12/10/2018 | 441 | $90.53 | $39,923 |
| 6/10/2019 | 878 | $91.97 | $80,749 |

75.     Thus, in total, before the fraud was exposed, he sold 2,396 Company shares on inside information, for which he received approximately $200,144. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

76.     The Company's 2019 Proxy Statement stated the following about Defendant Miller:

> **Andrew Miller** has served as a director since September 2016. He has served as executive vice president and chief financial officer of PTC since early 2015. At PTC, he is responsible for global finance, tax and treasury, investor relations, information technology, strategic sourcing, facilities, and customer administration.

Mr. Miller announced in January 2019 that he plans to retire from PTC during 2019. PTC is a global provider of software technology platforms and solutions that transform how companies create, operate, and service the "things" in the Internet of Things. From 2008 to 2015, Mr. Miller served as vice president and chief financial officer of Cepheid, a high-growth molecular diagnostics company. While at Cepheid, he built world-class finance and information technology teams and a nationally recognized investor relations program. Mr. Miller has also served in financial leadership roles at Autodesk, MarketFirst Software, Cadence Design Systems, and Silicon Graphics. He is a former director of United Online, Inc., a leading provider of consumer products and services over the internet. Mr. Miller holds a B.S. in Commerce with an emphasis in Accounting from Santa Clara University and was a CPA.

77.     Upon information and belief, Defendant Miller is a resident of California.

**Defendant Stacy**

78.     Defendant Michelle V. Stacy ("Stacy") has served as a Company director since August 2014. She also serves as a member of the Company's Compensation and Talent Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Stacy beneficially owned 12,782 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Stacy owned approximately $1.56 million worth of iRobot stock.

79.     For the fiscal year ended December 29, 2018, Defendant Stacy received $191,207 in compensation from the Company. This included $61,250 in fees earned or paid in cash and $129,957 in stock awards.

80.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stacy made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 8/22/2018 | 1,500 | $103.42 | $155,130 |
| 2/12/2019 | 1,500 | $114.00 | $171,000 |
| 2/27/2019 | 1,500 | $124.00 | $186,000 |

81.    Thus, in total, before the fraud was exposed, she sold 4,500 Company shares on inside information, for which she received approximately $512,130. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

82.    The Company's 2019 Proxy Statement stated the following about Defendant Stacy:

**Michelle V. Stacy** has served as a director since August 2014. During her five-year tenure at Keurig Inc., a division of Keurig Green Mountain, Inc., from 2008 to 2013, the company's revenue grew from $493 million in 2008 to $4.3 billion for 2013. Ms. Stacy is also a director of Coravin, Inc. and Hydrafacial Inc., and a former director of Young Innovations Inc. and Tervis Inc. She is a recognized expert on identifying strategies to successfully build top line growth for global brands. She holds a B.S. from Dartmouth College and an M.S. in Management from J.L. Kellogg Graduate School of Management — Northwestern University, and is bilingual in French and English.

83.    Upon information and belief, Defendant Stacy is a resident of Massachusetts.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

84.    By reason of their positions as officers and/or directors of iRobot, and because of their ability to control the business and corporate affairs of iRobot, the Individual Defendants owed iRobot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage iRobot in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of iRobot and its shareholders so as to benefit all shareholders equally.

85.    Each director and officer of the Company owes to iRobot and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

86.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of iRobot, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

87.    To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

88.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of iRobot, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

89.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

90.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of iRobot were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to iRobot's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how iRobot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of iRobot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that iRobot's operations would comply with all

applicable laws and iRobot's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

91.     Each of the Individual Defendants further owed to iRobot and the shareholders the duty of loyalty requiring that each favor iRobot's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

92.     At all times relevant hereto, the Individual Defendants were the agents of each other and of iRobot and were at all times acting within the course and scope of such agency.

93.     Because of their advisory, executive, managerial, and directorial positions with iRobot, each of the Individual Defendants had access to adverse, non-public information about the Company.

94.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by iRobot.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

95.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

96.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

97.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of iRobot was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

98.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

24

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

99.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of iRobot, and was at all times acting within the course and scope of such agency.

## **IROBOT'S CODE OF BUSINESS CONDUCT AND ETHICS**

100.    iRobot's Code of Business Conduct and Ethics (the "Code of Conduct") provides that the Code of Conduct was established to "aid the Company's directors, employees and contractors in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties."

101.    The Code of Conduct provides, as to "Standards of Conduct," that:

iRobot Corporation expects its directors, employees and contractors to follow the highest possible ethical standards in conducting business on behalf of the company. While this Code describes certain standards and policies, we expect you to guide your business conduct with our core values. It is not enough to merely conduct business in accordance with all applicable laws, rules and regulations; at iRobot we strive to avoid *even the appearance* of violations of this Code, impropriety or conflicts of interest.

102.    The Code of Conduct provides, as to "Conflicts of Interest," that:

The Company recognizes and respects the right of its directors, employees and contractors to engage in outside activities that they may deem proper and desirable, provided that these activities do not impair or interfere with the performance of their duties to the Company or their ability to act in the Company's best interests. In most, if not all, cases this will mean that our directors, employees and contractors must avoid situations that present a potential or actual conflict between their personal interests and the Company's interests.

A "conflict of interest" occurs when a director's, employee's or contractor's personal interest interferes with the Company's interests. Conflicts of interest may arise in many situations.

103.    The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

iRobot seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations. The Company also seeks partners, distributors, manufacturers, suppliers, contractors and customers who comply with all applicable laws, rules and regulations. No director, employee or contractor shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to-day company duties, nor shall any director, employee or contractor instruct others to do so.

104.    The Code of Conduct provides, as to "Protection and Proper Use of the Company's

Assets," that:

Directors, employees and contractors are expected to protect the Company's assets – such as electronic communications systems, information resources, material, facilities and equipment – that are entrusted to them and to protect the Company's assets in general.

* * *

Directors, employees and contractors are also expected to take steps to ensure that the Company's assets are used only for legitimate business purposes and to protect against waste and theft. It is recognized, however, that occasional personal use of equipment by directors, employees and contractors may occur without adversely affecting the interests of the Company.

105.    The Code of Conduct provides, as to "Fair Dealing," that:

Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part of the foundation for long-term success. Unlawful and unethical conduct, which may lead to short-term gains, may damage a company's reputation and long-term business prospects. Accordingly, it is the Company's policy that directors, employees and contractors must endeavor to deal ethically and lawfully with the Company's customers, suppliers, competitors and employees in all business dealings on the Company's behalf. No director, employee and contractor should take unfair advantage of another person in business dealings on the Company's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.

106.    The Code of Conduct provides, as to "Accuracy of Records," that:

The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to iRobot's continued and future business success.

Transactions between the Company and outside individuals and organizations should be promptly and accurately entered in the Company's books in accordance

with generally accepted accounting practices and principles, including accurate recording of all labor and material costs (including contract work, internal research and development, and bid and proposal work). No director, employee or contractor may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, employee or contractor may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

107.   The Code of Conduct provides, as to "Quality of Public Disclosures," that:

The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management is primarily responsible for monitoring the Company's public disclosures.

108.   The Code of Conduct provides, as to "Monitoring Compliance and Disciplinary Action," that:

The Company's management, under the supervision of its Board of Directors or a committee thereof or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee, will take reasonable steps from time to time to (i) monitor and audit compliance with the Code, and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code.

* * *

The Company's management shall periodically report to the Board of Directors or a committee thereof on these compliance efforts including, without limitation, periodic reporting of alleged violations of the Code and the actions taken with respect to any such violation.

109.   In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading

statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act. Moreover, nine of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

110.    iRobot is a global consumer robotics company, based in Bedford, Massachusetts. The Company designs, builds, and sells robots for use in various domestic spaces, including the Roomba vacuum cleaner robot.

111.    iRobot sells its products internationally through a network of retailers and distributors. During the fiscal year ended December 31, 2016, the Company's three largest distributors were SODC, Robopolis, and Amazon.com, Inc., through which iRobot generated 12.9%, 12.3%, and 10.4% of its total revenue, respectively.

112.    SODC is a privately-held corporation located in Tokyo, Japan, which primarily acted as a distributor for larger consumer goods companies such as iRobot in markets throughout Japan. Japan represents the largest market for consumer robotics outside of North America, and as such is a key market for iRobot.

113.    Similarly, Robopolis was a privately-held corporation located in Lyon, France, which distributed iRobot's products throughout EMEA. EMEA is another key region for iRobot, making up approximately 25% of iRobot's total revenue during the fiscal year ended December 31, 2016.

114.    As a consumer goods company, an important gauge of iRobot's profitability is the Company's Days in Inventory ("DII"). DII indicates the average number of days it takes for a company to turn its unsold product inventory into sales. If a company's DII is too high, this can indicate that the company is producing more goods than it can actually sell during a given period.

115.    The Roomba, and its various iterations, are consistently the Company's best-selling product offerings, and have in large part propelled the Company's revenue growth over the course of the Company's life. During the Relevant Period, however, the Company's revenue growth and sales figures were artificially inflated by way of the Individual Defendants' channel-stuffing scheme.

116.    Channel-stuffing is a fraudulent business practice, whereby a company sends retailers and distributors along the company's distribution channels more product than those distributors would realistically be able to sell to their consumers during a given time period. This allows the company engaging in the channel-stuffing scheme to record sales that would otherwise not have been booked until a subsequent fiscal quarter or year.

117.    Channel-stuffing has the effect of temporarily inflating a company's sales figures and profits, and is typically done in order to reach compensation goals set for a company's executive management, or to conceal poor sales figures that would otherwise result in a drop in a publicly-traded company's stock price. However, in a typical channel-stuffing scheme, once the company's distributors are unable to sell the excess product they have been sent, they will return the remaining product to the company, which will ultimately have to readjust its bottom line accordingly. As such, the ramifications of a channel-stuffing scheme will usually come to light one way or another.

118.    During the Relevant Period, the Individual Defendants caused the Company to "stuff the channels" of SODC and Robopolis. In connection with this scheme, the Individual Defendants caused the Company to acquire SODC's iRobot-related distribution business and Robopolis in November 2016 and October 2017, respectively. In doing so, the Individual Defendants were able to more directly effectuate their channel-stuffing scheme.

**False and Misleading Statements**

*November 21, 2016 Press Release*

119.    On November 21, 2016, the Company issued a press release announcing that the Company had signed an agreement to acquire SODC's iRobot-related distribution business. The press release stated the following, in relevant part:

> iRobot Corp. (NASDAQ: IRBT), a leader in consumer home robotics products, today announced that it has signed a definitive agreement to acquire the iRobot-related distribution business of privately-held Sales On Demand Corporation (SODC) based in Tokyo, Japan. The acquisition is expected to close in April 2017.

> The acquisition will better enable iRobot to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service.

*April 11, 2017 Press Release*

120.    On April 11, 2017, the Company issued a press release announcing that iRobot had completed its acquisition of SODC's iRobot-related distribution business, stating the following, in relevant part:

> iRobot Corp. (NASDAQ: IRBT), a leader in consumer robots, today announced that it has closed the previously announced acquisition of the iRobot-related distribution business of privately-held Sales On Demand Corporation (SODC) based in Tokyo, Japan. The preliminary purchase price of approximately $18 million, equal to the book value of the acquired assets, is subject to adjustments and will be finalized no later than May 18, 2017. The company also announced that Hajime Hikino, has been named president and representative executive officer of iRobot Japan. Mr. Hikino will assume day-to-day operational responsibility for all

market activities in country. Japan is a key strategic country for iRobot, given its status as the largest consumer robotics market outside of North America.

As announced on November 21, 2016, the acquisition will better enable iRobot to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. It also provides iRobot with a talented team in Japan that already understands iRobot and the Japanese market, and a team that has the relationships and proven capabilities required to succeed.

### April 17, 2017 Proxy Statement

121.    On April 17, 2017, the Company filed the 2017 Proxy Statement. Defendants Angle, Ali, Bell, Chwang, Ellinger, Finney, Miller, and Stacy solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

122.    With respect to the Company's Code of Conduct, the 2017 Proxy Statement stated, "[w]e have adopted a "code of ethics," as defined by regulations promulgated under the Securities Act of 1933, as amended, and the Exchange Act, that applies to all of our directors and employees worldwide, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions."

123.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

124.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's inventory levels would begin to increase substantially from quarter to quarter, contrary to certain of the Individual Defendants' representations; and (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

### *May 5, 2017 Form 10-Q*

125.    On May 5, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended April 1, 2017 with the SEC (the "May 2017 10-Q"). The May 2017 10-Q was signed by Defendant Dean, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Angle and Dean attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

126.    With respect to the Company's SODC acquisition, the May 2017 10-Q stated:

On April 3, 2017, we closed the previously-announced acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC) for approximately $18 million in cash, equal to the book value of the acquired assets. The $18 million acquisition price is subject to adjustments and will be finalized no later than May 18, 2017. ***Through direct control of sales, marketing, branding, channel relationships and customer service, we expect to maintain our leadership position in the consumer-robots market and accelerate growth of our business in Japan***.

(Emphasis added).

127.    With respect to the Company's internal controls over financial reporting, the May

2017 10-Q stated the following:

> Our management, with the participation of our Chief Executive Officer and Chief
> Financial Officer, evaluated the effectiveness of our disclosure controls and
> procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934,
> as amended, or the Exchange Act) as of the end of the period covered by this report.
> Based on that evaluation, our Chief Executive Officer and Chief Financial Officer
> concluded that our disclosure controls and procedures as of the end of the period
> covered by this report were effective at a reasonable assurance level in ensuring
> that information required to be disclosed by us in reports that we file or submit
> under the Exchange Act (i) is recorded, processed, summarized and reported within
> the time periods specified in the Securities and Exchange Commission's rules and
> forms; and (ii) accumulated and communicated to management, including our
> Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely
> discussions regarding required disclosure. We believe that a control system, no
> matter how well designed and operated, cannot provide absolute assurance that the
> objectives of the control system are met, and no evaluation of controls can provide
> absolute assurance that all control issues and instances of fraud, if any, within a
> company have been detected.

> There was no change in our internal control over financial reporting (as defined in
> Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by
> this report that has materially affected, or is reasonably likely to materially affect,
> our internal control over financial reporting.

### *July 25, 2017 Press Release*

128.    On July 25, 2017, the Company issued a press release announcing that the Company

had signed an agreement to acquire Robopolis, stating the following, in relevant part:

> iRobot Corp. (NASDAQ: IRBT), a leader in consumer robots, today announced
> that it has signed a definitive agreement to acquire privately-held Robopolis SAS
> (Robopolis), based in Lyon, France. The acquisition is expected to close in October
> 2017.

> Following iRobot's recent acquisition of its distributor in Japan, the Robopolis
> acquisition will enable iRobot to capitalize on market momentum driving
> accelerated adoption of robots for the home. It will further enhance the company's
> distribution network, ensure global brand consistency and better serve the needs of
> European consumers while driving continued growth in Western Europe through a

consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service.

129.     The press release also quoted Defendant Angle as follows:

"At this stage in the Western European market evolution, and the growth opportunity it presents, we feel a more direct go-to-market strategy is necessary to continue driving adoption of robots for the home," said Colin Angle, chairman and CEO of iRobot. "The Robopolis team has been instrumental in establishing iRobot as the leading consumer robotics brand in Western Europe. We look forward to them formally joining iRobot and working together to ensure continued growth."

***August 4, 2017 Form 10-Q***

130.     On August 4, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended July 1, 2017 with the SEC (the "August 2017 10-Q"). The August 2017 10-Q was signed by Defendant Dean, and contained SOX certifications signed by Defendants Angle and Dean attesting to the accuracy of the August 2017 10-Q.

131.     With respect to the Company's SODC and Robopolis acquisitions, the August 2017 10-Q stated:

On April 3, 2017, we closed the previously-announced acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC). The final purchase price, equal to the book value of the acquired assets, was $16.6 million. ***Through direct control of sales, marketing, branding, channel relationships and customer service, we expect to maintain our leadership position in the consumer-robots market and accelerate growth of our business in Japan***.

On July 25, 2017, we announced the signing of a definitive agreement to acquire our largest European distributor, Robopolis SAS (Robopolis). The aggregate purchase price for the acquisition will be approximately $141.0 million in cash, subject to customary purchase price adjustments set forth in the share purchase agreement, including an increase for the amount of cash on the Robopolis balance sheet at closing, a decrease for indebtedness assumed by the Company and adjustments for working capital of Robopolis as of the closing date. ***We anticipate that the acquisition will enhance our distribution network, ensure global brand consistency and better serve the needs of European consumers***. ***We expect to drive continued growth in the region through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service***. The acquisition is expected to close in the fourth quarter of 2017,

subject to the completion of customary closing conditions and receipt of required antitrust approvals.

(Emphasis added).

132.    With respect to the Company's internal controls over financial reporting, the May 2017 10-Q stated the following:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period covered by this report were effective at a reasonable assurance level in ensuring that information required to be disclosed by us in reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms; and (ii) accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure. We believe that a control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

There was no change in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *October 2, 2017 Press Release*

133.    On October 2, 2017, the Company issued a press release announcing that the Company had completed its acquisition of Robopolis, stating the following, in relevant part:

iRobot Corp. (NASDAQ: IRBT), a leader in consumer robots, today announced that it has closed the previously announced acquisition of Robopolis SAS (Robopolis), based in Lyon, France. The preliminary purchase price of $141 million, is subject to normal purchase price adjustments and is expected to be finalized no later than Q1 2018.

Europe is a key strategic region for iRobot and provides an excellent opportunity for further growth. As announced on July 25, 2017, the acquisition will enable

iRobot to capitalize on the current market momentum, driving accelerated adoption of robotic floor cleaners. The EMEA region comprised approximately 25% of iRobot's 2016 consumer revenue. Robopolis represented nearly half of iRobot's EMEA revenues in 2016.

With the acquisition, iRobot will further extend its overseas control of market activities, including consistent global messaging, that will help drive greater adoption of robotic vacuum cleaners and affirm iRobot's segment leadership.

134.    The press release also quoted Defendant Angle as follows:

"As iRobot expands globally, we are excited about the current and future opportunities in Europe," said Colin Angle, chairman and chief executive officer of iRobot. "With the closing of this acquisition, we welcome a team that has already solidified iRobot's market leading position in Europe and is well positioned to drive continued growth in the region."

***November 3, 2017 Form 10-Q***

135.    On November 3, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 with the SEC (the "November 2017 10-Q"). The November 2017 10-Q was signed by Defendant Dean, and contained SOX certifications signed by Defendants Angle and Dean attesting to the accuracy of the November 2017 10-Q.

136.    With respect to the Company's SODC and Robopolis acquisitions, the November 2017 10-Q stated:

On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC). The final purchase price, equal to the book value of the acquired assets, was $16.6 million. ***Through direct control of sales, marketing, branding, channel relationships and customer service, we expect to maintain our leadership position in the consumer-robots market and accelerate growth of our business in Japan***.

On October 2, 2017, we closed the previously-announced acquisition of our largest European distributor, Robopolis SAS (Robopolis). At the closing, we paid approximately $170.1 million in cash offset by acquired cash of approximately $31.6 million held by Robopolis and its subsidiaries at closing, resulting in a net cash outlay of approximately $138.4 million. ***We anticipate that the acquisition will enhance our distribution network, ensure global brand consistency and better serve the needs of European consumers. We expect to drive continued growth in the region through a consistent approach to all market activities***

***including sales, marketing, branding, channel relationships and customer service.***

(Emphasis added).

137.    With respect to the Company's internal controls over financial reporting, the

November 2017 10-Q stated the following:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period covered by this report were effective at a reasonable assurance level in ensuring that information required to be disclosed by us in reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms; and (ii) accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure. We believe that a control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

> There was no change in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***February 7, 2018 Press Release***

138.    On February 7, 2018, the Company issued a press release reporting the Company's

financial results for the fiscal quarter and year ended December 30, 2017. The press release touted

the Company's sales figures and its recent distributor acquisitions in Japan and Europe, stating the

following:

> In our first full year as a solely consumer-focused business, we delivered fantastic quarterly and full-year revenue growth of 54% and 34% respectively, over Q4 and full-year 2016. Record Q4 revenue was driven by very strong sales in the United States, and in EMEA, as the overall category continued to grow at an accelerating

rate. We achieved record growth while maintaining unambiguous global product and brand leadership in the robotic vacuum cleaner (RVC) category.

The opportunity ahead of us is tremendous. Global household penetration of robotic vacuum cleaners remains extremely low, in the single digits. Strong economic conditions worldwide are fueling overall global growth and positive consumer sentiment. We have demonstrated that in regions where we have run marketing programs to educate prospective customers about Roomba, we have increased our market share, and our recent distributor acquisitions enable us to extend our strategic marketing programs to Japan and Europe.

### February 16, 2018 Form 10-K

139.    On February 16, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 30, 2017 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Angle, Dean, Ali, Bell, Chwang, Ellinger, Finney, Miller, and Stacy, and contained SOX certifications signed by Defendants Angle and Dean attesting to the accuracy of the 2017 10-K.

140.    With respect to the Company's SODC and Robopolis acquisitions, the 2017 10-K stated:

During 2017, we continued to expand our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC) based in Tokyo, Japan for approximately $16.6 million in cash. *The acquisition of SODC will better enable us to maintain our leadership position and accelerate the growth of our business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service*. It also expands our presence and customer outreach opportunities in Japan. Additionally, on October 2, 2017, we closed the acquisition of our largest European distributor, Robopolis SAS, a French company (Robopolis), for approximately $170.1 million in cash, which was offset by acquired cash held by Robopolis and its subsidiaries, resulting in a net cash outlay of approximately $132.1 million. *We anticipate that this acquisition will enhance our distribution network, ensure global brand consistency and help us better serve the needs of European consumers. We expect to drive continued growth in global markets through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service. Both acquisitions provide us with more direct control over the go-to-market execution in these key regions*.

(Emphasis added).

141.    With respect to the Company's internal controls over financial reporting, the 2017

10-K stated the following:

> Under the supervision and with the participation of management, including our principal executive and financial officers, we assessed the Company's internal control over financial reporting as of December 30, 2017, based on criteria for effective internal control over financial reporting established in *Internal Control — Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We have excluded the business acquisitions completed during fiscal year 2017, including our acquisitions of iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS), from the assessment of the effectiveness of internal control over financial reporting as of December 30, 2017. iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS) are wholly-owned subsidiaries whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting collectively represent approximately 8.3% and 23.9% of total assets, respectively and approximately 9.9% and 13.0% of total revenues, respectively, of the related consolidated financial statement amounts as of and for the year ended December 30, 2017. Based on this assessment, management concluded that the Company maintained effective internal control over financial reporting as of December 30, 2017 based on the specified criteria.
>
> * * *
>
> During the quarter ended December 30, 2017, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### April 10, 2018 Proxy Statement

142.    On April 10, 2018, the Company filed the 2018 Proxy Statement. Defendants

Angle, Ali, Bell, Ellinger, Finney, Miller, and Stacy solicited the 2018 Proxy Statement filed

pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and

omissions.[2]

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

143.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[w]e have adopted a 'code of ethics,' as defined by regulations promulgated under the Securities Act of 1933, as amended, and the Exchange Act, that applies to all of our directors and employees worldwide, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions."

144.    The 2018 Proxy Statement also called for shareholder approval of, among other things, the Company's 2018 Stock Option and Incentive Plan (the "2018 Incentive Plan"), which would authorize the Company to reserve a maximum of 1.75 million shares of Company stock to be issued to the Company's officers and directors.

145.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

146.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's inventory levels would begin to increase substantially from quarter to quarter, contrary to certain of the Individual Defendants' representations; and (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

147.    As a result of the material misstatements and omissions contained in the 2018 Proxy

Statement, Company shareholders approved the 2018 Incentive Plan.

***May 4, 2018 Form 10-Q***

148.    On May 4, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal

quarter ended March 31, 2018 with the SEC (the "May 2018 10-Q"). The May 2018 10-Q was

signed by Defendant Dean, and contained SOX certifications signed by Defendants Angle and

Dean attesting to the accuracy of the May 2018 10-Q.

149.    With respect to the Company's SODC and Robopolis acquisitions, the May 2018

10-Q stated:

> During 2017, we continued to expand our global operations with the acquisition of
> two of our major distributors in Japan and Europe. On April 3, 2017, we closed the
> acquisition of the iRobot-related distribution business of Sales On Demand
> Corporation (SODC) based in Tokyo. Additionally, on October 2, 2017, we
> acquired our largest European distributor, Robopolis SAS, a French company
> (Robopolis). ***We expect to drive continued growth in global markets through a
> consistent approach to all market activities including sales, marketing, branding,
> channel relationships and customer service. Both acquisitions provide us with
> more direct control over the go-to-market execution in these key regions.***

(Emphasis added).

150.    With respect to the Company's internal controls over financial reporting, the May

2018 10-Q stated the following:

> Our management, with the participation of our Chief Executive Officer and Chief
> Financial Officer, evaluated the effectiveness of our disclosure controls and
> procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934,
> as amended, or the Exchange Act) as of the end of the period covered by this report.
> Based on that evaluation, our Chief Executive Officer and Chief Financial Officer
> concluded that our disclosure controls and procedures as of the end of the period
> covered by this report were effective at a reasonable assurance level in ensuring
> that information required to be disclosed by us in reports that we file or submit
> under the Exchange Act (i) is recorded, processed, summarized and reported within
> the time periods specified in the Securities and Exchange Commission's rules and
> forms; and (ii) accumulated and communicated to management, including our
> Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely

41

discussions regarding required disclosure. We believe that a control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

There was no change in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### June 12, 2018 NASDAQ Investor Conference

151.    On June 12, 2018, Defendant Dean attended the NASDAQ Investor Conference, during which she stated the following with respect to the Company's SODC and Robopolis acquisitions:

> [T]here were two situations where we felt by going direct to market, we would be better off and that resulted in the two acquisitions we made last year . . . . And the rationale there was that these distributors have done a great job, getting us established and creating that initial market awareness . . . . [T]he real benefits we think we will get from that, there's certainly a pickup in revenue and margin by taking out the middleman, but it's really this direct control of go-to-market activities that we think will further help us penetrate the market there and drive further adoption of the products in the categories.

152.    Later during the day on June 12, 2018, an investment analyst elevated its rating of the Company's stock from "above average" to good," in light of the statements made during the NASDAQ Investor Conference with respect to the Company's purportedly optimistic long-term prospects.

### July 25, 2018 Earnings Call

153.    On July 25, 2018, the Company held a conference call to discuss the Company's earnings for the second fiscal quarter of 2018. During the call, Defendant Angle commented on the demand for the Company's products, stating, "[i]n the U.S., sales were robust . . . as consumers continued to appreciate the value proposition of our products. In EMEA, revenue grew 51% where

we saw strong demand, also benefitting from the revenue uplift associated with sales in the EMEA countries, where we now sell direct."

154.    Defendant Angle also discussed the Company's DII, stating that the Company expected its DII to increase "temporarily" due to "typical quarterly functions," and that "[w]e continue working to identify operating efficiencies to improve working capital and reduce DII over time."

155.    During the call, in response to an analyst asking Defendant Dean to confirm that there had been no changes in the Company's channel inventory, Defendant Dean stated, "[y]eah, I'd say the channel inventory levels are where they normally are. I don't think they've changed dramatically from where they were at the end of Q1 or last year."

### *August 3, 2018 Form 10-Q*

156.    On August 3, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 with the SEC (the "August 2018 10-Q"). The August 2018 10-Q was signed by Defendant Dean, and contained SOX certifications signed by Defendants Angle and Dean attesting to the accuracy of the August 2018 10-Q.

157.    With respect to the Company's SODC and Robopolis acquisitions, the August 2018 10-Q stated:

> During 2017, we continued to expand our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC) based in Tokyo. Additionally, on October 2, 2017, we acquired our largest European distributor, Robopolis SAS, a French company (Robopolis). ***We expect to drive continued growth in global markets through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service. Both acquisitions provide us with more direct control over the go-to-market execution in these key regions.***

(Emphasis added).

158.    With respect to the Company's internal controls over financial reporting, the May

2018 10-Q stated the following:

> Our management, with the participation of our Chief Executive Officer and Chief
> Financial Officer, evaluated the effectiveness of our disclosure controls and
> procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934,
> as amended, or the Exchange Act) as of the end of the period covered by this report.
> Based on that evaluation, our Chief Executive Officer and Chief Financial Officer
> concluded that our disclosure controls and procedures as of the end of the period
> covered by this report were effective at a reasonable assurance level in ensuring
> that information required to be disclosed by us in reports that we file or submit
> under the Exchange Act (i) is recorded, processed, summarized and reported within
> the time periods specified in the Securities and Exchange Commission's rules and
> forms; and (ii) accumulated and communicated to management, including our
> Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely
> discussions regarding required disclosure. We believe that a control system, no
> matter how well designed and operated, cannot provide absolute assurance that the
> objectives of the control system are met, and no evaluation of controls can provide
> absolute assurance that all control issues and instances of fraud, if any, within a
> company have been detected.
>
> There was no change in our internal control over financial reporting (as defined in
> Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by
> this report that has materially affected, or is reasonably likely to materially affect,
> our internal control over financial reporting.

### *September 5, 2018 Citi Global Technology Conference*

159.    On September 5, 2018, Defendant Angle attended the Citi Global Technology

Conference. During the conference, in response to an analyst question regarding the Company's

SODC and Robopolis acquisitions, Defendant Angle stated the following:

> [W]e saw that there are opportunities to improve the performance of these
> distributors by focusing on how they were going to market, in particular how they
> were approaching online sales, because these, the two distributors we bought, were
> very much—had DNA in the brick-and-mortar domain and we felt missing
> opportunities online. And so that we made these two acquisitions [last year] and
> have been able to really successfully move them into a more mixed focus between
> brick and mortar and online, start deploying the marketing programs that have been
> proven out in North America, and are very excited about those acquisitions driving
> the growth that we're predicting, continuing well into the future.

### *October 24, 2018 Earnings Call*

160.    On October 24, 2018, the Company held a conference call to discuss the Company's earnings for the third fiscal quarter of 2018. During the call, in response to a question about the Company's growth in the wake of the Company's SODC and Robopolis acquisitions, Defendant Dean stated, "[w]e're continuing to see good momentum in all the markets regionally, U.S., EMEA, and Japan, and I think that will all be growth contributors as we look forward."

### November 2, 2018 Form 10-Q

161.    On November 2, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2018 with the SEC (the "November 2018 10-Q"). The November 2018 10-Q was signed by Defendant Dean, and contained SOX certifications signed by Defendants Angle and Dean attesting to the accuracy of the November 2018 10-Q.

162.    With respect to the Company's SODC and Robopolis acquisitions, the November 2018 10-Q stated:

> During 2017, we continued to expand our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation ("SODC") based in Tokyo. Additionally, on October 2, 2017, we acquired our largest European distributor, Robopolis SAS, a French company ("Robopolis"). *We expect to drive continued growth in global markets through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service. Both acquisitions provide us with more direct control over the go-to-market execution in these key regions.*

(Emphasis added).

163.    With respect to the Company's internal controls over financial reporting, the November 2018 10-Q stated the following:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period

45

covered by this report were effective at a reasonable assurance level in ensuring that information required to be disclosed by us in reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms; and (ii) accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure. We believe that a control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

There was no change in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***February 7, 2019 Earnings Call***

164.     On February 7, 2019, the Company held a conference call to discuss the Company's earnings for the full year and fourth fiscal quarter of 2018. During the call, Defendant Angle stated, "[r]evenue grew 24%, crossing the $1 billion revenue threshold in an increasingly competitive market and we delivered an operating margin of nearly 10% after absorbing the impact of tariffs in Q4."

165.     Defendant Angle ascribed the Company's remarkable revenue growth during the fourth fiscal quarter of 2018 to increased demand for the Company's products, stating that there was "[s]ubstantial demand for our game-changing Roomba i7 and i7+," and that "over-performance in Japan was driven by robust Q4 demand supported by our sales and marketing programs in that region."

***February 14, 2019 Form 10-K***

166.     On February 14, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 29, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants Angle, Dean, Ali, Bell, Ellinger, Finney, Kao, Miller, and Stacy, and contained

SOX certifications signed by Defendants Angle and Dean attesting to the accuracy of the 2018 10-K.

167.    With respect to the Company's SODC and Robopolis acquisitions, the 2018 10-K stated:

> On October 2, 2017, the Company closed the acquisition of its largest European distributor, Robopolis SAS, a French company ("Robopolis"), subsequently renamed iRobot France SAS. ***The acquisition will better enable the Company to maintain its leadership position and grow its business in several Western European countries through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service***. The initial purchase price was approximately $170.1 million in cash, net of acquired cash of $38.0 million, subject to the finalization of the working capital adjustment in accordance with the stock purchase agreement. During the first quarter of 2018, the working capital adjustment was finalized and resulted in a reduction in the purchase price of $0.7 million. During the fourth quarter of 2018, the Company finalized the allocation of the purchase price and recorded a $1.5 million adjustment for uncertain pre-acquisition income tax positions in various taxing jurisdictions against goodwill. The acquisition was a stock purchase. The results of operations for this acquisition have been included in the Company's operating results since the acquisition date.

> * * *

> On April 3, 2017, the Company closed its acquisition of the iRobot-related distribution business of Sales On Demand Corporation ("SODC"), iRobot Japan G.K., for approximately $16.6 million in cash, equal to the book value of the acquired assets. ***The acquisition will better enable the Company to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service***. It also expands the Company's presence and customer outreach opportunities in Japan. The acquisition was a stock purchase. The results of operations for this acquisition have been included in the Company's operating results since the acquisition date.

(Emphasis added).

168.    With respect to the Company's internal controls over financial reporting, the 2018 10-K stated the following:

> Under the supervision and with the participation of management, including our principal executive and financial officers, we assessed the Company's internal control over financial reporting as of December 29, 2018, based on criteria for

effective internal control over financial reporting established in *Internal Control — Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management concluded that the Company maintained effective internal control over financial reporting as of December 29, 2018 based on the specified criteria.

* * *

During the quarter ended December 29, 2018, we have fully extended our oversight and monitoring processes that support our internal control over financial reporting to include entities acquired in the Robopolis SAS acquisition that were exempt in the prior year. There has been no other change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### April 8, 2019 Proxy Statement

169.    On April 8, 2019, the Company filed the 2019 Proxy Statement. Defendants Angle, Ali, Bell, Kao, Ellinger, Finney, Miller, and Stacy solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

170.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[w]e have adopted a "code of ethics," as defined by regulations promulgated under the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), that applies to all of our directors and employees worldwide, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions."

171.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

172.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's inventory levels would begin to increase substantially from quarter to quarter, contrary to certain of the Individual Defendants' representations; and (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

173.    The statements referenced above in ¶¶ 119, 124–141, 148–151, and 153–168 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, finances, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's inventory levels would begin to increase substantially from quarter to quarter, contrary to certain of the Individual Defendants'

representations; and (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

### The Truth Gradually Emerges

174.    During after-market hours on April 23, 2019, the Company issued a press release reporting the Company's financial results for the first fiscal quarter of 2019. The press release disclosed lower than expected revenue for the quarter, as well as unusually high inventory levels of approximately $181 million, up from $112 million in April 2018. For the three months ended March 30, 2019, the press release reported DII of 140, up from DII of 101 for the three months ended March 31, 2018.

175.    On this news, the price of the Company's stock dropped from $130.57 per share at the close of trading on April 23, 2019, to $100.42 per share at the close of trading on April 24, 2019, on heavy volume, representing a loss in value of over 23%.

176.    During after-market hours on July 23, 2019, the Company issued a press release reporting the Company's financial results for the second fiscal quarter of 2019. The press release announced that the Company was cutting its 2019 full-year earnings forecast from a range of $1.28 billion – $1.31 billion, down to a range of $1.2 billion – $1.25 billion. The Company also cut its earnings per share guidance from a range of $3.15 – $3.40 per share down to $2.40 – $3.15 per share.

177.    On this news, the price of the Company's stock fell yet again, from $89.63 per share at the close of trading on July 23, 2019, to $74.51 per share at the close of trading on July 24, 2019, on heavy volume, representing a loss in value of nearly 17%.

178.    Finally, during after-market hours on October 22, 2019, the Company issued a press release reporting the Company's financial results for the third fiscal quarter of 2019. The press

release revealed that the Company was cutting down the high end of the full-year 2019 earnings forecast the Company had previously reported, from $1.25 billion to $1.21 billion. Moreover, the Company's inventory levels had shot up once again to $248 million, or 149 DII, as compared to $161 million, or 113 DII during the third fiscal quarter of 2018. The press release attempted to blame the Company's decreased earnings guidance on a "suboptimal" customer response during the quarter, stating, "[a]lthough our third-quarter results were strong, sell-through following our late July price increases was suboptimal. Given this outcome and our belief that the RVC category was at a growth inflection point prior to tariffs, we elected to roll back our pricing to pre-tariff levels on most of our products."

179.    On this news, the price of iRobot shares dropped once more, from $54.03 per share at the close of trading on October 22, 2019, to $49.06 per share at the close of trading on October 23, 2019, representing a loss in value of over 9%.

## Repurchases

180.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $49.9 million to repurchase approximately 798,794 shares of its own common stock at artificially inflated prices.

181.    According to the May 2018 10-Q, between February 25, 2018 and March 31, 2018, the Company purchased 30,000 shares of its common stock for approximately $1.92 million, at an average price of $64.32 per share.

182.    As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between February 25, 2018 and March 31, 2018 was approximately $457,800.

183.    According to the August 2018 10-Q, between April 1, 2018 and April 28, 2018, the Company purchased 309,333 shares of its common stock for approximately $19.5 million, at an average price of $63.35 per share.

184.    As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between April 1, 2018 and April 28, 2018 was approximately $4.42 million.

185.    According to the August 2018 10-Q, between April 29, 2018 and May 26, 2018, the Company purchased 357,367 shares of its common stock for approximately $21.8 million, at an average price of $61.06 per share.

186.    As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between April 29, 2018 and May 26, 2018 was approximately $4.28 million.

187.    According to the August 2018 10-Q, between May 27, 2018 and June 30, 2018, the Company purchased 102,094 shares of its common stock for approximately $6.63 million, at an average price of $65.03 per share

188.    As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between May 27, 2018 and June 30, 2018 was approximately $1.63 million.

189.    In total, the Company overpaid an aggregate amount of approximately $10.7 million for repurchases of its own stock during the Relevant Period.

## DAMAGES TO IROBOT

190.    As a direct and proximate result of the Individual Defendants' conduct, iRobot will lose and expend many millions of dollars.

191.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.    Such losses include the Company's overpayment by over $10.7 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

193.    Additionally, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

194.    As a direct and proximate result of the Individual Defendants' conduct, iRobot has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

195.    Plaintiff brings this action derivatively and for the benefit of iRobot to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act as well as the aiding and abetting thereof.

196.    iRobot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

197.    Plaintiff is, and has been at all relevant times, a shareholder of iRobot. Plaintiff will adequately and fairly represent the interests of iRobot in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

198.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

199.    A pre-suit demand on the Board of iRobot is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Angle, Ali, Bell, Ellinger, Finney, Kao, Miller, and Stacy (the "Director-Defendants"), along with non-party Eva Manolis (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

200.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in channel-stuffing, to make and/or cause the Company to make false and misleading statements and omissions of material fact while seven of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $10.7 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

201.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused the Company to engage in channel-stuffing and made and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, nine of the Individual Defendants, including seven of the Directors, sold Company stock at artificially inflated prices based on inside material information.

202.    As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

203.    Additional reasons that demand on Defendant Angle is futile follow. Defendant Angle is a co-founder of the Company, and currently serves as the Company's CEO and Chairman of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Angle with his principal occupation, and he receives handsome compensation, including $5,683,314 in 2018 for his services. Defendant Angle was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $20.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Angle is a defendant in the Securities Class Actions. For these reasons, Defendant

Angle breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Ali is futile follow. Defendant Ali has served as a Company director since August 2015. He also serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Ali has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $246,275 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Ali signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Ali breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Bell is futile follow. Defendant Bell has served as a Company director March 2016. He also serves as the Chair of the Company's Compensation and Talent Committee. Defendant Bell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded at least $458,233 in proceeds,

demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Bell signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Bell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.    Additional reasons that demand on Defendant Ellinger is futile follow. Defendant Ellinger has served as a Company director since November 2011. She also serves as the Chair of the Company's Nominating and Corporate Governance Committee. Defendant Ellinger has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded at least $1.1 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant Ellinger signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Ellinger breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant Finney is futile follow. Defendant Finney has served as a Company director since January 2017. She also serves as a member of the Company's Audit Committee and Compensation and Talent Committee. Defendant Finney has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the

Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Finney signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Finney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant Kao is futile follow. Defendant Kao has served as a Company director since June 2018. He also serves as a member of the Company's Audit Committee. Defendant Kao has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded at least $15,327 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Kao signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Kao breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since September 2016. He also serves as the Chair of the Company's Audit Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Miller has received and continues to receive compensation for his role as a

director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $200,144 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Miller signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Stacy is futile follow. Defendant Stacy has served as a Company director since August 2014. She also serves as a member of the Company's Compensation and Talent Committee. Defendant Stacy has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in channel-stuffing and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded at least $512,130 in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant Stacy signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Stacy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

211.    Additional reasons that demand on the Board is futile follow.

212.    As described above, seven of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendants Angle, Ali, Bell, Ellinger, Kao, Miller, and Stacy collectively received proceeds of over $22.6 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

213.    Additionally, Defendants Angle, Ali, Bell, Ellinger, Finney, Kao, Miller, and Stacy, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $10.7 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

214.    Defendants Finney, Kao, and Miller (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in channel-stuffing and to issue false and misleading financial statements with the SEC. Thus, the Audit

Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

215.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

216.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Individual Defendants' scheme to cause the Company to engage in channel-stuffing, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

217.    iRobot has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for iRobot any part of the damages iRobot suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

218.    The Individual Defendants' conduct described herein and summarized above, including the decisions for the Company to engage in the repurchases of its own stock could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

219.    The acts complained of herein constitute violations of fiduciary duties owed by iRobot's officers and directors, and these acts are incapable of ratification.

220.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of iRobot. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of iRobot, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

221.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause iRobot to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

222.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and if not all of them, at least five of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

225.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

226.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

227.    Under the direction and watch of the Directors, the 2017, 2018, and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's inventory levels would begin to increase substantially from quarter to quarter, contrary to certain of the Individual Defendants' representations; and (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

228.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

229.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, appointment of an independent auditor, an advisory vote on executive compensation, an advisory vote on the frequency of executive compensation, approval of an employee stock purchase plan, approval of amendments to the Company's certificate of incorporation to eliminate supermajority voting requirements, to declassify the Board of Directors, and to eliminate the prohibition on shareholders' ability to call a special meeting, and, in the case of the 2018 Proxy Statement, approval of the 2018 Incentive Plan.

230.    The false and misleading elements of the Proxy Statements led to the approval of the 2018 Incentive Plan and to the re-election of Defendants Angle, Ali, Bell, Chwang, Ellinger, Finney, Kao, Miller, and Stacy, which allowed them to continue breaching their fiduciary duties to iRobot.

231.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

232.    Plaintiff on behalf of iRobot has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

233.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding iRobot. Not only is iRobot now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also

a victim of the unlawful scheme perpetrated upon iRobot by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 798,794 of its own shares at artificially-inflated prices, damaging iRobot.

235.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

236.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about iRobot not misleading.

237.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by iRobot. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The

Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

238.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

239.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

240.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants, by virtue of their positions with iRobot and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of iRobot and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause iRobot and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

243.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

244.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of iRobot's business and affairs.

246.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

247.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of iRobot.

248.    The Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

249.    In further breach of their fiduciary duties owed to iRobot, the Individual Defendants intentionally or recklessly wasted corporate assets on repurchases of the Company's own stock at artificially inflated prices, caused the Company to engage in channel-stuffing, and made and/or caused the Company to make false and misleading statements of material fact. Specifically, the Individual Defendants made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) the Individual Defendants caused the Company to engage in channel-stuffing in order to artificially inflate the Company's revenue and sales figures; (2) the Individual Defendants planned to cause the Company to acquire certain of its largest distributors in order to further engage in and conceal this channel-stuffing scheme; (3) as a result of the channel-stuffing scheme, the Company's inventory levels would begin to increase

substantially from quarter to quarter, contrary to certain of the Individual Defendants' representations; and (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

250.   The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

251.   In breach of their fiduciary duties, nine of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact.

252.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of iRobot's securities and disguising insider sales.

253.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly.

254.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

255.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, iRobot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

256.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

257.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

258.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, iRobot.

259.    The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from iRobot that was tied to the performance or artificially inflated valuation of iRobot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

260.    Plaintiff, as a shareholder and a representative of iRobot, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

261.    Plaintiff on behalf of iRobot has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

262.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence iRobot, for which they are legally responsible.

264.    As a direct and proximate result of the Individual Defendants' abuse of control, iRobot has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, iRobot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

265.    Plaintiff on behalf of iRobot has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

266.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of iRobot in a manner consistent with the operations of a publicly-held corporation.

268.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, iRobot has sustained and will continue to sustain significant damages.

269.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

270.    Plaintiff on behalf of iRobot has no adequate remedy at law.

### EIGHTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

271.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused iRobot to waste valuable corporate assets and to incur many millions of dollars of legal liability and costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

273.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

274.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

275.    Plaintiff on behalf of iRobot has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of iRobot, and

that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to iRobot;

(c)     Determining and awarding to iRobot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing iRobot and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect iRobot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-laws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of iRobot to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding iRobot restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 9, 2020                                   Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:/s/Joshua Baker_____
Joshua Baker (BBO #695561)
Phillip Kim
101 Greenwood Ave., Suite 440
Jenkintown, Pennsylvania 19046
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jbaker@rosenlegal.com
            pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# **VERIFICATION**

I, Robert Truman am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___1/7/2020___, 2020.

DocuSigned by:

*Robert Truman*

D62B03B3284B43E

Robert Truman