UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: IROBOT CORPORATION DERIVATIVE LITIGATION, | : : : | |
| This Document Relates to: | : : | Lead Case No. 1:20-cv-10034-DJC |
| ALL ACTIONS | : : : | |

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiffs Robert Truman, William Tasco,  David Katz, and Alexa Ruhfass ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant iRobot Corporation ("iRobot" or the "Company"), file this Verified Consolidated Shareholder Derivative Complaint against Colin M. Angle, Alison Dean, Mohamad Ali, Michael Bell, Ronald Chwang, Deborah G. Ellinger, Elisha Finney, Ruey-Bin Kao, Andrew Miller, and Michelle V. Stacy (collectively, the "Individual Defendants," and together with iRobot, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for their complaint against the Defendants, Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding iRobot, legal filings, news reports, securities analysts' reports and advisories about the Company, the action in the United States District Court for the District of Massachusetts styled In re iRobot Corporation Securities Litigation case no. 1:19-cv-12536-DJC

1

(the "Securities Class Action") and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This shareholder derivative action seeks to remedy wrongdoing committed by iRobot's officers and directors from September 13, 2017 through the present (the "Relevant Period").

2.      The Company is a consumer robotics enterprise that designs and builds a variety of robots that offer cleaning services, mapping and navigational solutions, and other functionalities. The Company's primary markets include Europe, the Middle East, Africa, North America, and Japan. The Company sells its products through a network of international distributors.

3.      The Company was formed in approximately 2002 and the backbone of its business has been the "Roomba" robot vacuum, which accounted for nearly 90% of the Company's revenue during the Relevant Period. According to published reports, the Roomba was the first robot vacuum cleaner ("RVC") to be commercially successful and once dominated the market.

4.      By mid-September 2017, however, established vacuum manufacturers like Dyson and Hoover, in addition to start-ups, began to compete with the Company by offering vacuums at lower price points with similar if not superior technology.

5.      These new entrants into the marketplace sold vacuums for as low as $200 compared to the Roomba, which retailed for anywhere between $500 and $1,300.  In September 12, 2017, SharkNinja ("Shark"), the manufacturer of the best-selling upright vacuums in the United States, introduced its own version of an RVC named the Shark ION.  It became immediately apparent to the marketplace that the Shark ION offered the same quality as the Company's premium brands (Roomba 600 and 800 models) but sold for only $349.

6.      Wall Street analysts were quick to question the Company about its planned strategic response to this new competitor and how its product line would both differentiate itself and attract

2

customers despite a premium price tag. Defendants immediately assured the stockholder that the Company did not face significant competition from Shark and that its own products, despite being offered at a premium price, remained competitive.  Wall Street analysts were persuaded by Defendants' positive statements and continued to maintain "bullish" recommendations.

7.      Defendants, however, knew that their statements to the marketplace concerning the ability to weather competition were false and misleading.  The truth began to emerge through a series of partial disclosures when Defendants began to disclos that the Company was experiencing the adverse effects of increased competition, began to report disappointing financial guidance, and admitted that there was "absolutely increased competitive pressure".

8.      Nevertheless, Defendants tried to downplay the effect competition was having on the Company, especially from Shark's new line of products. Defendants falsely stated that "competitive pressure was embedded in the guidance that we've given." Moreover, Defendants assured investors that the new competition was not significant enough to alter the Company's aggressive guidance or decrease its market share by a material amount.

9.      In September 2018, the Company launched two new lines of Roomba models.  The first was the i7 and i7+, an expensive, premium – tier vacuum retailing for $699 and $949, respectively.  Second, was an entry-level model called the e5, which retailed for $499, which was still $100 more than Shark's most expensive model.  The new i7 models, however, sold poorly because they suffered from both performance issues and software problems. Nevertheless, Defendants touted the purported strong demand for the products even though they were not selling well, and consumers considered them too expensive.

10.      The Company's problems were compounded by the U.S. government's imposition of 10% tariffs on all Chinese imports, effective September 24, 2018.  This was significant to the Company because its products, including 100% of Roombas, were manufactured in China. Accordingly, the Company would either have to absorb the additional costs arising from the tariffs or pass them on to consumers.  Initially, the Company elected to absorb the cost and not increase prices. Defendants, however, failed to disclose the tariff related problems and the effect they would

have on earnings.  In fact, Defendant stated that demand for its premium-tier products remained strong and claimed that would enable the Company to pass on any tariff related costs to consumers.

11.     In January 2019, the Company announced that it would pass along tariff costs to consumers by increasing prices on the I7 and I7+ by approximately 15%. This resulted in the I7+ retailing at over $1,000.  Defendants knew that the $1,000 price point was well above what the average consumer was prepared to pay for a vacuum.

12.     In February 2019, the Company issued guidance that exceeded analysts' expectations despite what Defendants knew about the impact of tariffs. Defendants went so far as to reassure investors that the Company's business was not being adversely impacted by tariffs because consumers were willing to accept modest price increases to offset any tariff related cost issues.  At the same time, Defendants falsely reassured investors the Company was not losing market share but, instead, would see an increase in sales through Amazon, even though Defendants were observing a material decrease in sales from stores.

13.     Over the course of following months, the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors began to seep into the market.  First, in April 2019, the Company announced first quarter 2019 results significantly below analysts' expectations premised on unsold, excess inventory sitting on retailers' shelves. Defendants, however, simultaneously reassured the market that demand for its premium products remained strong and reaffirmed prior strong revenue guidance.  On this news, the price of the Company's stock plummeted from $130.57 per share at the close of trading on April 23, 2019, to $100.42 per share at the close of trading on April 24, 2019, representing a decline of over 23%.

14.     Second, in early May 2019 the U.S. government announced that it was increasing tariffs on Chinese imports to 25% from 10% effective May 10, 2019. This sharp increase in tariffs necessitated that the Company increase the prices of its already expensive, premium products to levels that consumers considered even more unattractive.

4

15.     Third, on July 23, 2019 and July 24, 2019, Company shocked the market when it released second quarter 2019 results which cut its full – year earnings forecast due to the direct and indirect impact of the U.S. – China trade war. During an earnings call held on July 24, 2019, defendant Angle disclosed, in response to securities industry analysts' questions, that downward revisions to the Company's guidance was the result of tariff related price increases that made the Company's products economically unattractive to consumers.  Nevertheless, Defendants tried to appease the market by touting the Company's premium – tier strategy claiming that there was continued strong demand for the Company's new s9 model Roomba even though retailed for over $1,000.  Again, the price of the Company's stock dropped from $89.63 per share at the close of trading on July 23, 2019, to $74.51 per share at the close of trading on July 24, 2019, on heavy volume, a decline of nearly 17%.

16.     Finally, on October 22, 2019, the Company issued its financial results for the third fiscal quarter of 2019, which disclosed that the Company was cutting its full-year earnings forecast even further, while attempting to blame the Company's disheartening reductions in growth on "suboptimal" customer response, in blatant contrast to the Individual Defendants' prior statements concerning demand for the Company's products. On this news, the price of iRobot shares dropped once more, from $54.03 per share at the close of trading on October 22, 2019, to $49.06 per share at the close of trading on October 23, 2019, a decline of over 9%.

17.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in securities fraud by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, during the Relevant Period, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, inter alia, that the Individual Defendants caused the Company to issue false statements concerning competition, the attractiveness of its products, the adverse effects of tariffs and that the Company failed to maintain proper internal controls.

18.     As a result of the foregoing, the Individual Defendants' and the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

19.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls, procedures, and internal controls over financial reporting.

20.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while nine of them engaged in lucrative insider sales, netting proceeds of over $36.6 million. Approximately 798,794 shares of the Company's common stock were repurchased during the Relevant Period for over $49.9 million. As the Company's stock was actually only worth $49.06 per share during that time, the price at closing on October 23, 2019, the Company overpaid by over $10.7 million in total.

21.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer and its Chief Financial Officer ("CFO") to the Securities Class Action, the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

22.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, eight of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of their not being disinterested and/or independent directors,

a majority of the iRobot Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

28.     Plaintiffs are current stockholders of iRobot. Plaintiffs have continuously held iRobot common stock at all relevant times.

**Nominal Defendant iRobot**

29.     iRobot is a Delaware corporation with its principal executive offices located at 8 Crosby Drive, Bedford, Massachusetts 01730. iRobot's shares trade on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "IRBT."

**Defendant Angle**

30.     Defendant Colin M. Angle ("Angle") is a co-founder of the Company and has served as the Company's President from 1992 through 1997, as CEO since 1997, and as Chairman of the Board since October 2008. According to the Company's Schedule 14A filed with the SEC on April 8, 2019 (the "2019 Proxy Statement"), as of March 8, 2019, Defendant Angle beneficially owned 561,993 shares of the Company's common stock, which represented 2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Angle owned approximately $68.6 million worth of iRobot stock.

31.     For the fiscal year ended December 29, 2018, Defendant Angle received $5,683,314 in compensation from the Company. This included $742,308 in salary, $3,987,756 in stock awards, $945,000 in non-equity incentive plan compensation, and $8,250 in all other compensation.

32.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Angle made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------------|------------------|-----------------|-------------|
| 12/26/2017 | 45,200 | $80.06 | $3,618,621 |
| 6/12/2018 | 13,334 | $75.00 | $1,000,050 |
| 7/6/2018 | 12,175 | $82.14 | $1,000,054 |
| 11/1/2018 | 11,117 | $89.96 | $1,000,085 |

| 11/28/2018 | 63,070 | $90.01 | $5,682,397 |
| 1/2/2019 | 24,739 | $80.85 | $2,000,006 |
| 1/7/2019 | 11,765 | $85.00 | $1,000,025 |
| 3/11/2019 | 16,272 | $122.52 | $1,995,813 |
| 6/3/2019 | 11,486 | $87.07 | $1,000,060 |

33.   Thus, in total, before the misconduct was exposed, he sold 209,158 Company shares on inside information, for which he received approximately $18,297,111. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the above-referenced conduct.

34.   The Company's 2019 Proxy Statement stated the following about Defendant Angle:

**Colin M. Angle,** a co-founder of iRobot, has served as chairman of the board since October 2008, as chief executive officer since June 1997, and prior to that, as our president since November 1992. He has served as a director since October 1992. Mr. Angle previously worked at the National Aeronautical and Space Administration's Jet Propulsion Laboratory where he participated in the design of the behavior controlled rovers that led to Sojourner exploring Mars in 1997. He is a director of two private companies, Striiv, Inc. and Ixcela, Inc. Mr. Angle holds a B.S. in Electrical Engineering and an M.S. in Computer Science, both from MIT.

**Defendant Dean**

35.   Defendant Alison Dean ("Dean") has served as the Company's Executive Vice President, CFO, and treasurer since April 2013. On February 3, 2020, Defendant Dean resigned as Executive Vice President, CFO and treasurer, effective May 4, 2020. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Dean beneficially owned 66,043 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Dean owned approximately $8.07 million worth of iRobot stock.

36.     For the fiscal year ended December 29, 2018, Defendant Dean received $2,320,281 in compensation from the Company. This included $472,693 in salary, $1,360,538 in stock awards, $478,800 in non-equity incentive plan compensation, and $8,250 in all other compensation.

37.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Dean made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 7/25/2018 | 16,778 | $85.00 | $1,426,130 |
| 9/24/2018 | 18,488 | $104.10 | $1,924,482 |
| 3/15/2019 | 23,625 | $126.12 | $2,979,654 |

38.     Thus, in total, before the misconduct was exposed, she sold 58,891 Company shares on inside information, for which she received approximately $6,330,266. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the above-referenced conduct.

39.     The Company's 2019 Proxy Statement stated the following about Defendant Dean:

**Alison Dean** has served as our executive vice president, chief financial officer, treasurer and principal accounting officer since April 2013. Ms. Dean previously served as our senior vice president, corporate finance from February 2010 until March 2013. From March 2007 until February 2010, Ms. Dean served as our vice president, financial controls & analysis. From August 2005 until March 2007, Ms. Dean served as our vice president, financial planning & analysis. From 1995 to August 2005, Ms. Dean served in a number of positions at 3Com Corporation, including vice president and corporate controller from 2004 to 2005 and vice president of finance — worldwide sales from 2003 to 2004. She has also served as a director at Everbridge, Inc. since July 2018. Ms. Dean holds a B.A. in Business Economics from Brown University and an M.B.A. from Boston University.

40.     Upon information and belief, Defendant Dean is a resident of Massachusetts.

**Defendant Ali**

41.     Defendant Mohamad Ali ("Ali") has served as a Company director since August 2015. He also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Ali beneficially owned 11,791 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Ali owned approximately $1.44 million worth of iRobot stock.

42.     For the fiscal year ended December 29, 2018, Defendant Ali received $194,957 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $129,957 in stock awards.

43.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Ali made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 7/13/2018 | 542 | $80.94 | $43,869 |
| 9/4/2018 | 743 | $111.10 | $82,547 |
| 6/10/2019 | 785 | $91.97 | $72,196 |
| 9/4/2019 | 780 | $61.11 | $47,663 |

44.     Thus, in total, before the misconduct was exposed, he sold 2,850 Company shares on inside information, for which he received approximately $246,275. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the above-referenced conduct.

45.     The Company's 2019 Proxy Statement stated the following about Defendant Ali:

**Mohamad Ali** has served as a director since August 2015. He has served as the president, chief executive officer and director of Carbonite, Inc. from December 2014 to present. Mr. Ali has successfully led Carbonite's continued growth, serving the ever-evolving technology needs of small and midsize businesses and

consumers. Boston-based Carbonite provides cloud and hybrid backup and recovery solutions for home and business. Previously, Mr. Ali served as chief strategy officer at Hewlett-Packard, a manufacturer of computers and enterprise products, from 2012 to 2014 and president of Avaya Global Services, an enterprise communications company. He also served in senior leadership roles at IBM Corporation, a multinational technology and consulting company, where he acquired numerous companies to build IBM's analytics and big data business. In addition to serving on the board of directors of Carbonite, Mr. Ali is also a director of Oxfam America and Massachusetts Technology Leadership Council and previously served on the Board of Directors of City National Corporation and City National Bank. He was named to Boston Business Journal's 2008 "40 Under 40" list, and recognized by Massachusetts High Tech magazine as a 2011 All-Star. Mr. Ali holds a B.S. and an M.S. in Electrical Engineering, both from Stanford University.

46.     Upon information and belief, Defendant Ali is a resident of Massachusetts.

**Defendant Bell**

47.     Defendant Michael Bell ("Bell") has served as a Company director March 2016. He also serves as the Chair of the Company's Compensation and Talent Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Bell beneficially owned 2,846 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Bell owned approximately $347,781 worth of iRobot stock.

48.     For the fiscal year ended December 29, 2018, Defendant Bell received $204,957 in compensation from the Company. This included $75,000 in fees earned or paid in cash and $129,957 in stock awards.

49.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Bell made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 8/23/2018 | 4,355 | $105.22 | $458,235 |

50.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the above-referenced conduct.

51.     The Company's 2019 Proxy Statement stated the following about Defendant Bell:

**Michael Bell** has served as a director since March 2016. He has worked at Silver Spring Networks, Inc., Intel Corporation, Apple, Inc., and Palm, Inc. Mr. Bell was the chief executive officer and president of Silver Spring Networks, a leading networking platform and solutions provider for smart energy networks, since September 2015 until his retirement in January 2018. Previously, from 2010 to 2015 he held various roles at Intel Corporation, a multinational technology corporation specializing in the production of semiconductor chips, including Corporate Vice President New Devices Group, Corporate VP Mobile and Communications Group and Corporate Vice President Ultra Mobility Group. He was head of Product Development at Palm, Inc. from 2007 to 2010. He worked at Apple, Inc. from 1991 to 2007 and played significant roles in development of Apple iPhone and Apple TV products, serving as Vice President, CPU Software from 2002 to 2007. He holds a B.S. in Mechanical Engineering from the University of Pennsylvania.

**Defendant Chwang**

52.     Defendant Ronald Chwang ("Chwang") served as a Company director from 1998 until he resigned on May 23, 2018.

53.     For the fiscal year ended December 29, 2018, Defendant Chwang received $45,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

54.     The Company's Schedule 14A filed with the SEC on April 10, 2018 (the "2018 Proxy Statement") stated the following about Defendant Chwang:

**Ronald Chwang, Ph.D.** has served as a director since November 1998 and brings extensive experience in technology, manufacturing, supply chain, business development and Asian operations. Since January 2005, he has been the chairman and president of iD Ventures America, LLC (formerly known as Acer Technology Ventures, LLC) part of the iD SoftCapital Group, a venture investment and management consulting service group. He was the chief executive officer of Acer America from 1992 until 1997, growing it to over $1 Billion in revenues, and then became chairman and president of Acer Technology Ventures until 2004, managing high-tech venture investment activities in North America. Previously, he was president of two Acer business groups in Taiwan, from 1986 to 1991. Dr. Chwang holds a B.Eng. (with honors) in Electrical Engineering from McGill University and

a Ph.D. in Electrical Engineering from the University of Southern California. Dr. Chwang will retire from the board following the expiration of his term at the 2018 annual meeting after nearly twenty years of service on our board.

**Defendant Ellinger**

55.     Defendant Deborah G. Ellinger ("Ellinger") has served as a Company director since November 2011. She also serves as the Chair of the Company's Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Ellinger beneficially owned 16,858 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Ellinger owned approximately $2.06 million worth of iRobot stock.

56.     For the fiscal year ended December 29, 2018, Defendant Ellinger received $209,957 in compensation from the Company. This included $80,000 in fees earned or paid in cash and $129,957 in stock awards.

57.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Ellinger made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 8/21/2018 | 1,000 | $100.00 | $100,000 |
| 4/15/2019 | 2,000 | $130.00 | $260,000 |

58.     Thus, in total, before the misconduct was exposed, she sold 3,000 Company shares on inside information, for which she received approximately $360,000. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the above-referenced conduct.

59.     The Company's 2019 Proxy Statement stated the following about Defendant Ellinger:

**Deborah G. Ellinger** has served as a director since November 2011. Ms. Ellinger is also a director of Covetrus, Inc., a $4 billion tech-enabled veterinarian services and supply company and is a senior advisor to the Boston Consulting Group. She was the president and CEO of Ideal Image, a chain of 130 medical spas providing non-surgical cosmetic procedures across the US and Canada, from 2016 until her retirement in March 2018; chairman and chief executive officer of The Princeton Review, a company which assists students globally in test preparation and tutoring, from 2012 to 2014; president of Restoration Hardware, a luxury home furnishings retailer, from 2008 to 2009; and chief executive officer of Wellness Pet Food, a natural pet-food company, from 2004 to 2008. Ms. Ellinger led each of those companies while they were owned by two private equity firms, and three of the four transitioned to new ownership, yielding three to seven times return on capital to investors. Previously, she served as an executive vice president at CVS Pharmacy, a senior vice president at Staples, and a partner at The Boston Consulting Group, and began her career with Mellon Financial Corporation. Ms. Ellinger also serves on the board of The Commonwealth Institute, a nonprofit, and is a former director of Interpublic Group, The Princeton Review, Sealy Corporation, National Life Group, and several other private companies. Her assignments have taken her all over the world; she has lived and worked in Europe, Asia, and America. Ms. Ellinger is qualified as a Barrister-at- Law in London, as a member of the Inner Temple. She holds an M.A. and B.A. in Law and Mathematics from the University of Cambridge, England.

## Defendant Finney

60.     Defendant Elisha Finney ("Finney") has served as a Company director since January 2017. She also serves as a member of the Company's Audit Committee and Compensation and Talent Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Finney beneficially owned 3,273 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Finney owned approximately $399,960 worth of iRobot stock.

61.     For the fiscal year ended December 29, 2018, Defendant Finney received $197,457 in compensation from the Company. This included $67,500 in fees earned or paid in cash and $129,957 in stock awards.

62.     The Company's 2019 Proxy Statement stated the following about Defendant Finney:

**Elisha Finney** has served as a director since January 2017. Until her retirement in May 2017, she served as executive vice president and CFO of Varian Medical

Systems since 1999, a leading developer of radiation oncology treatments and software, where she served in various management roles since 1988. Ms. Finney's management responsibilities included corporate accounting; corporate communications and investor relations; internal financial and compliance audit; risk management; tax and treasury, and information technology. She previously served as a board member at Altera Corporation from 2011 to December 2015, Thoratec Corporation from 2007 to 2013, and Laserscope from 2005 to 2006. She holds a B.A. in Risk Management and Insurance from the University of Georgia and an M.B.A. from Golden Gate University where she received the 1992 "Outstanding Graduate of the Masters Programs in Finance" Award. Ms. Finney was the 2015 UGA Terry College of Business Distinguished Alumni of the Year and the recipient of Silicon Valley Business Journal's 2013 "Women of Influence" Award.

**Defendant Kao**

63.     Defendant Ruey-Bin Kao ("Kao") has served as a Company director since June 2018. He also serves as a member of the Company's Audit Committee.

64.     For the fiscal year ended December 29, 2018, Defendant Kao received $245,788 in compensation from the Company. This included $25,822 in fees earned or paid in cash and $219,966 in stock awards.

65.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Kao made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 7/8/2019 | 170 | $90.16 | $15,327 |

66.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the above-referenced conduct.

67.     The Company's 2019 Proxy Statement stated the following about Defendant Kao:

**Ruey-Bin Kao** was appointed to the iRobot Board of Directors in June 2018. He has more than 30 years of expertise in technology, telecommunication, corporate governance, and consumer business. Dr. Kao has held senior leadership roles, developing country growth strategy, driving revenue growth and profitability through enhanced customer and government engagements, and elevating corporate brand, at numerous global companies. From January 2014 to December 2017, he

served as the Chief Executive Officer, Greater China, at Telstra Corporation Ltd., Australia's leading telecommunications and technology company. Previously, he served as Country President of Applied Materials China, the global leader in materials engineering solutions for semiconductor, flat panel display and solar photovoltaic industries, from 2011 to 2013; Managing Director and General Manager of Enterprise Business in China Hewlett-Packard Co. Ltd from 2010 to 2011; and China Chairman, president and several senior roles at Motorola from 1993 to 2010. Dr. Kao currently serves on the board of China National Travel Services Group Corporation Ltd., and was a former director of Shenhua Group Corporation Ltd. (now known as China Energy Investment Corporation Ltd.). Dr. Kao holds a bachelor degree in Computer Science from Tamkang University, master's degree in Computer and Information Science from the University of Delaware and a doctorate degree of Business Administration from the Hong Kong Polytechnic University.

**Defendant Miller**

68.     Defendant Andrew Miller ("Miller") has served as a Company director since September 2016. He also serves as the Chair of the Company's Audit Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Miller beneficially owned 1,715 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Miller owned approximately $209,573 worth of iRobot stock.

69.     For the fiscal year ended December 29, 2018, Defendant Miller received $204,957 in compensation from the Company. This included $75,000 in fees earned or paid in cash and $129,957 in stock awards.

70.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Miller made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 12/27/2017 | 441 | $80.11 | $35,328 |
| 6/11/2018 | 636 | $69.41 | $44,144 |

| 12/10/2018 | 441 | $90.53 | $39,923 |
| 6/10/2019 | 878 | $91.97 | $80,749 |

71.     Thus, in total, before the misconduct was exposed, he sold 2,396 Company shares on inside information, for which he received approximately $200,144. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the above-referenced conduct.

72.     The Company's 2019 Proxy Statement stated the following about Defendant Miller:

> **Andrew Miller** has served as a director since September 2016. He has served as executive vice president and chief financial officer of PTC since early 2015. At PTC, he is responsible for global finance, tax and treasury, investor relations, information technology, strategic sourcing, facilities, and customer administration. Mr. Miller announced in January 2019 that he plans to retire from PTC during 2019. PTC is a global provider of software technology platforms and solutions that transform how companies create, operate, and service the "things" in the Internet of Things. From 2008 to 2015, Mr. Miller served as vice president and chief financial officer of Cepheid, a high-growth molecular diagnostics company. While at Cepheid, he built world-class finance and information technology teams and a nationally recognized investor relations program. Mr. Miller has also served in financial leadership roles at Autodesk, MarketFirst Software, Cadence Design Systems, and Silicon Graphics. He is a former director of United Online, Inc., a leading provider of consumer products and services over the internet. Mr. Miller holds a B.S. in Commerce with an emphasis in Accounting from Santa Clara University and was a CPA.

**Defendant Stacy**

73.     Defendant Michelle V. Stacy ("Stacy") has served as a Company director since August 2014. She also serves as a member of the Company's Compensation and Talent Committee. According to the 2019 Proxy Statement, as of March 8, 2019, Defendant Stacy beneficially owned 12,782 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2019 was $122.20, Defendant Stacy owned approximately $1.56 million worth of iRobot stock.

74.     For the fiscal year ended December 29, 2018, Defendant Stacy received $191,207 in compensation from the Company. This included $61,250 in fees earned or paid in cash and $129,957 in stock awards.

75.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the misconduct was exposed, Defendant Stacy made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 8/22/2018 | 1,500 | $103.42 | $155,130 |
| 2/12/2019 | 1,500 | $114.00 | $171,000 |
| 2/27/2019 | 1,500 | $124.00 | $186,000 |

76.     Thus, in total, before the misconduct was exposed, she sold 4,500 Company shares on inside information, for which she received approximately $512,130. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the above-referenced conduct.

77.     The Company's 2019 Proxy Statement stated the following about Defendant Stacy:

**Michelle V. Stacy** has served as a director since August 2014. During her five-year tenure at Keurig Inc., a division of Keurig Green Mountain, Inc., from 2008 to 2013, the company's revenue grew from $493 million in 2008 to $4.3 billion for 2013. Ms. Stacy is also a director of Coravin, Inc. and Hydrafacial Inc., and a former director of Young Innovations Inc. and Tervis Inc. She is a recognized expert on identifying strategies to successfully build top line growth for global brands. She holds a B.S. from Dartmouth College and an M.S. in Management from J.L. Kellogg Graduate School of Management — Northwestern University, and is bilingual in French and English.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

78.     By reason of their positions as officers and/or directors of iRobot, and because of their ability to control the business and corporate affairs of iRobot, the Individual Defendants owed

iRobot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage iRobot in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of iRobot and its shareholders so as to benefit all shareholders equally.

79.     Each director and officer of the Company owes to iRobot and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

80.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of iRobot, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

81.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

82.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of iRobot, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

83.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

84.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of iRobot were required to, among other things:

a)  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to iRobot's own Code of Business Conduct and Ethics;

b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)  remain informed as to how iRobot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of iRobot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that iRobot's operations would comply with all applicable laws and iRobot's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

85.    Each of the Individual Defendants further owed to iRobot and the shareholders the duty of loyalty requiring that each favor iRobot's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

86.    At all times relevant hereto, the Individual Defendants were the agents of each other and of iRobot and were at all times acting within the course and scope of such agency.

87.    Because of their advisory, executive, managerial, and directorial positions with iRobot, each of the Individual Defendants had access to adverse, non-public information about the Company.

88.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by iRobot.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

89.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

90.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

91.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of iRobot was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

92.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

93.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of iRobot, and was at all times acting within the course and scope of such agency.

## IROBOT'S CODE OF BUSINESS CONDUCT AND ETHICS

94.     iRobot's Code of Business Conduct and Ethics (the "Code of Conduct") provides

that the Code of Conduct was established to "aid the Company's directors, employees and

contractors in making ethical and legal decisions when conducting the Company's business and

performing their day-to-day duties."

95.     The Code of Conduct provides, as to "Standards of Conduct," that:

iRobot Corporation expects its directors, employees and contractors to follow the
highest possible ethical standards in conducting business on behalf of the company.
While this Code describes certain standards and policies, we expect you to guide
your business conduct with our core values. It is not enough to merely conduct
business in accordance with all applicable laws, rules and regulations; at iRobot we
strive to avoid *even the appearance* of violations of this Code, impropriety or
conflicts of interest.

96.     The Code of Conduct provides, as to "Conflicts of Interest," that:

The Company recognizes and respects the right of its directors, employees and
contractors to engage in outside activities that they may deem proper and desirable,
provided that these activities do not impair or interfere with the performance of
their duties to the Company or their ability to act in the Company's best interests.
In most, if not all, cases this will mean that our directors, employees and contractors
must avoid situations that present a potential or actual conflict between their
personal interests and the Company's interests.

A "conflict of interest" occurs when a director's, employee's or contractor's
personal interest interferes with the Company's interests. Conflicts of interest may
arise in many situations.

97.     The Code of Conduct provides, as to "Compliance with Laws, Rules and

Regulations," that:

iRobot seeks to conduct its business in compliance with both the letter and the spirit
of applicable laws, rules and regulations. The Company also seeks partners,
distributors, manufacturers, suppliers, contractors and customers who comply with
all applicable laws, rules and regulations. No director, employee or contractor shall
engage in any unlawful activity in conducting the Company's business or in
performing his or her day-to-day company duties, nor shall any director, employee
or contractor instruct others to do so.

98.     The Code of Conduct provides, as to "Protection and Proper Use of the Company's Assets," that:

> Directors, employees and contractors are expected to protect the Company's assets – such as electronic communications systems, information resources, material, facilities and equipment – that are entrusted to them and to protect the Company's assets in general.

* * *

> Directors, employees and contractors are also expected to take steps to ensure that the Company's assets are used only for legitimate business purposes and to protect against waste and theft. It is recognized, however, that occasional personal use of equipment by directors, employees and contractors may occur without adversely affecting the interests of the Company.

99.     The Code of Conduct provides, as to "Fair Dealing," that:

> Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part of the foundation for long-term success. Unlawful and unethical conduct, which may lead to short-term gains, may damage a company's reputation and long-term business prospects. Accordingly, it is the Company's policy that directors, employees and contractors must endeavor to deal ethically and lawfully with the Company's customers, suppliers, competitors and employees in all business dealings on the Company's behalf. No director, employee and contractor should take unfair advantage of another person in business dealings on the Company's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.

100.    The Code of Conduct provides, as to "Accuracy of Records," that:

> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to iRobot's continued and future business success.
>
> Transactions between the Company and outside individuals and organizations should be promptly and accurately entered in the Company's books in accordance with generally accepted accounting practices and principles, including accurate recording of all labor and material costs (including contract work, internal research and development, and bid and proposal work). No director, employee or contractor may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, employee or contractor may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, officers and employees who

have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

101.    The Code of Conduct provides, as to "Quality of Public Disclosures," that:

The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management is primarily responsible for monitoring the Company's public disclosures.

102.    The Code of Conduct provides, as to "Monitoring Compliance and Disciplinary Action," that:

The Company's management, under the supervision of its Board of Directors or a committee thereof or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee, will take reasonable steps from time to time to (i) monitor and audit compliance with the Code, and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code.

* * *

The Company's management shall periodically report to the Board of Directors or a committee thereof on these compliance efforts including, without limitation, periodic reporting of alleged violations of the Code and the actions taken with respect to any such violation.

103.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' plan to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act. Moreover, nine of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also, in violation of the Codeof Conduct, the

Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

104.    iRobot is a global consumer robotics company, based in Bedford, Massachusetts. The Company designs, builds, and sells robots for use in various domestic spaces, including the Roomba vacuum cleaner robot.

105.    iRobot sells its products internationally through a network of retailers and distributors. During the fiscal year ended December 31, 2016, the Company's three largest distributors were SODC, Robopolis, and Amazon.com, Inc., through which iRobot generated 12.9%, 12.3%, and 10.4% of its total revenue, respectively.

### False and Misleading Statements

106.    Plaintiffs allege that the statements below were materially false and misleading because, among other reasons, they did not disclose material information of which Individual Defendants were aware or were reckless in not knowing. These statements artificially inflated or artificially maintained the price of iRobot's publicly traded common stock.

107.    Because Individual Defendants spoke on the issues below, they had a duty to not mislead investors or withhold material information. Individual Defendants' statements created an impression of a situation at iRobot that significantly differed from the reality.

108.    During the Relevant Period, Individual Defendants made various misrepresentations and omissions concerning: the impact of increased competition in the RVC market (and the extent of such impact) on iRobot's sales, store shelf space, market share, and overall financial performance; the Company's strategy to focus nearly all of its sales and marketing resources on its premium-tier Roombas at the expense of its entry-level models; and the impact of

Chinese trade tariffs on its business, including the risks associated with the Company's premium-tier strategy in light of the tariffs and increasing price pressure from lower-cost competition.

**September 13, 2017 – Morgan Stanley Laguna Conference**

109.    On September 13, 2017, during the Morgan Stanley Laguna Conference, Defendant Dean answered analysts' questions about Roomba competition. Defendant Dean acknowledged analysts' concerns regarding "the buzz [] about SharkNinja coming into the market," but downplayed the effect of this new competitor's launch on iRobot's business, comparing it to the previous holiday season when Bissell, Hoover, and Black & Decker introduced new RVCs. Following a question from an analyst in the following exchange, Defendant Dean reduced the competitors' ability to compete with Roomba from a price and performance perspective, based on iRobot's alleged market research showing that these products were "not resonating" with consumers:

> Analyst: How are you differentiating your product between some of the new competitors that are coming in, in the United States?
>
> Dean: So our products, from a price and performance perspective, are really offering the best value proposition. Again, we have multiple offerings on a premium scale. And what we found with the competitors to date is that the combination of the price point they're coming in at and the features, functionality and, ultimately, the quality of the experience for the consumers is not resonating. As we went into the holiday season last year, again, we had the Hoovers, the Bissells, Black + Deckers that were making a big push. They did get onto retail shelves for the holiday season. But their performance was not very good, and we ended up seeing increased orders from our retailers because our products were doing so well versus those new entrants in the market. And again, I think it's a combination of the price points and the functionality, the value, the quality that we offer the consumers and the experience.

110.    The statement on September 13, 2017 at the Morgan Stanley Laguna Conference in the preceding paragraph was false and misleading or omitted material facts when made because, contrary to Defendants' statements, iRobot knew that increased cheaper competition, including notably Shark, was in fact "resonating" with consumers given these competitor products' similar "features, functionality and, ultimately, the quality of the experience" to that of the Roombas, but

at a much lower "price point," as demonstrated by, inter alia, internal market research and sales data accessible to and reviewed by the Individual Defendants, which showed that at that time iRobot was increasingly losing sales and store shelf space (a key indicator of competitive performance that the Company closely tracked) to its competitors. As discussed herein, multiple former iRobot employees confirmed that, beginning no later than September of 2017, when Shark entered the RVC market with its ION robots, Individual Defendants became increasingly concerned that iRobot's sales were declining significantly due to an influx of new competition in the RVC market, which was selling well because of these products' similar features and comparable performance but at a much lower price point. Several former employees confirmed that Individual Defendants knew from iRobot's own market research, at that time these statements were made, that new, increased competition from Shark and other competitors was already negatively impacting the Company's sales to a greater extent than iRobot expected as iRobot began to lose shelf space at retail stores to its competitors. Thus, by the fall of 2017, Individual Defendants were heavily concerned about this competition and the impact it was having on iRobot's sales, contrary to the above public statement reassuring investors that competition did not pose a significant threat to iRobot's business as it was not "resonating" with consumers.

**October 25, 2017 – 3Q17 Earnings Call**

111.    On October 25, 2017, during iRobot's 3Q17 earnings call, Defendant Angle informed investors that "[d]emand from U.S. retailers for our robots increased during the last quarter. We continue to gain space, exposure and momentum in the market, driving higher full year U.S. revenue expectations for the second time this year, even with the availability of new competitive products."

112.    In response to an analyst's question concerning competition at different price points, Defendant Angle minimized emerging lower-end competition as "not particularly material" to iRobot's business and assured that it was not "cannibalistic of," i.e. diminishing, iRobot's Roomba sales and revenue growth. Indeed, he claimed that this growing lower-end competition was actually a positive development for iRobot's business because it was purportedly increasing

29

the RVC market without competing directly with, and thus taking sales away from, iRobot's higher-end products. Specifically, he stated:

> Analyst: Colin, just curious in terms of you guys mentioning increased competition at the low-end in the U.S. Can you kind of just help us define your partition [of] low-end from high-end right now in terms of future sets or, as part of this, simply your more aggressive pricing strategy?
>
> Angle: [I]n a maturing market, you're going to have products that are lower gross margin, lower profit and, obviously, lower function start to be -- emerge at the bottom of the price points. And given the remarkable growth we're seeing in the category, this is an inevitable occurrence. Above that, we still see tremendous growth that we've enjoyed thus far, having a bright future, won't give exact numbers yet because it's not February. But that's the area where we think the opportunity to generate the most gross margin dollars, the area where intellectual property and innovation are most strongly rewarded. And this is just a natural evolution. It's not particularly material at this point in time because, to date, there really hasn't been much [competition] at least in the United States at the low-end. But we expect it to develop over the next few years. We don't view it as cannibalistic of our growth. We actually see it as supportive of the overall category maturation. And when we talk about the -- our analysis of our market opportunity, a lot of this low-end product goes against areas and parts of the market that we were not targeting and thus does, in fact, in a noncannibalistic way, grow the marketplace.

113.    Afterward on the call, Defendant Dean, in response to an analyst's question about the impact of competition on iRobot's different tiers of Roombas, said that the 600 series, iRobot's lower-end entry-level Roomba, globally represented approximately 35% of iRobot's overall Roomba revenue, with the 800 series and the 900 series, the higher-end premium-tier products, representing equally about 30% (i.e., collectively 60% of Roomba revenues). Defendant Angle then assured that iRobot's revenue contribution percentages would continue, and insisted again that this increasing lower-end competition was actually beneficial to iRobot's business, as follows:

> [O]ur brand strength and our customer promise is going to [] create a compelling reason for iRobot to maintain its success with our entry-level price points, which in a more mature marketplace would be in the midrange. Although there is -- we have done some things where we've offered special SKUs to get people under the franchise from time to time. But that midrange entry point is something that you should imagine us continuing. But with the higher price point premium products, the things that will, in total, be the larger percentage of our revenue. So we're quite

happy with [] this premium strategy, and we think it is resilient and even benefits from this low-end emergence.

114.    Defendant Angle and Dean's statements at the 3Q17 Earnings Call above downplaying the impact of increasing competition on iRobot's business were knowingly false and materially misled investors because, contrary to Defendants' statements, iRobot's was not, "continu[ing] to gain space, exposure and momentum in the market . . . even with the availability of new competitive products," nor was the Company's premium-strategy "benefit[ting] from the low end emergence" of increased competition, which was in fact "material at this point in time" and was "cannibalistic of [iRobot's] growth." Instead, this cheaper new competition in the low-end was in fact saturating the RVC market, resonating well with consumers, and thus materially impacting, i.e., cannibalizing, iRobot's store shelf space and sales at this time in 2017.  Therefore, this emerging lower-end competition was decreasing, rather than increasing, demand for iRobot's products, both its entry-level and premium-tier models, contrary to Defendants' positive comments above that they were not seeing any significant adverse competitive trends.

115.    Further, Defendant Angle's statement that "[d]emand from U.S. retailers for our robots increased during the last quarter" and that Defendants "continue to gain space, exposure and momentum in the market, driving higher full year U.S. revenue expectations for the second time this year, even with the availability of new competitive products" was additionally false and misleading because even if iRobot did see increased demand from U.S. retailers in the prior quarter (3Q17), Defendant Angle knew by this time, but failed to disclose to investors, materially adverse competitive trends undermining these assurances, which were reported to iRobot, including in weekly Field Marketing reports and sales calls with Creative Channel Services ("CCS"), a third party marketing agency, contracted by the Company, for January 2015 to July 2019. Specifically, Defendants knew then, that iRobot was losing store shelf space and sales to this increasing cheaper competition—omitted adverse facts that rendered his positive statement touting iRobot's increased demand and that iRobot "continue[d] [] gain[ing] [of] space" in this RVC market materially misleading.

116.    Analysts were encouraged by Individual Defendants' statements confirming that iRobot's competitive position was still strong despite new competition entering the RVC market. For example, PiperJaffray reported on October 25, 2017 that, although they "have increasing concerns that competition is increasing," "we remain upbeat about the future of home robot adoption and iRobot's position in this market." That same day, Sidoti & Company also noted that, "[d]espite an increasingly competitive environment, IRBT was able to increase its average selling price by 9% in 3Q:17 to $249 from $229 in 3Q:16, illustrating iRobot's consumer brand strength."

**February 8, 2018 – 4Q17 / FY2017 Earnings Call and Partial Disclosure**

117.    Although iRobot acknowledged some impact from increased RVC competition on the February 8, 2018 4Q17 / FY2017 earnings call, Individual Defendants soon after downplayed the impactt of this by falsely reassuring investors that this increased "competitive pressure" was not significant enough to alter the Company's aggressive guidance of increased growth rates. Thus, Defendants implied that demand for iRobot's products remained strong, insisting that iRobot presently remained "well-equipped to win" against its competition. Specifically, during this earnings call, Defendant Angle responded as follows to the analyst's follow-up question about any changes in competitive trends that iRobot was experiencing:

> Analyst: Great. And then just looking at the U.S., wondering whether or not you're seeing given that inflection in demand, any changes in the ASP [average sale price] dynamics, any pricing pressure, anything that's shifting here in 2018 versus what you saw in 2016, 2017?
>
> Angle: Sure. I think that there is absolutely an increased competitive pressure. And we work to try to protect ourselves against us and given us – giving ourselves some optionality as to how do we address competitive pressure that is embedded in the guidance that we've given. We see the low end of the robot vacuum cleaning segment growing, where there are an increasing number of entrants down sort of below the 299 price points that we have traditionally played at. And iRobot certainly intends to continue to aggressively compete throughout the market.
>
> . . .
>
> So I think that again in the guidance that we gave, we allowed ourselves some amount of ability to respond to competitive threats. And we think we are well

equipped to win in 2018 as should be taken away from the confidence in our revenue growth rates.

118.    In addition to the reasons stated above, Defendant Angle's statements and reassurances at the 4Q17 / FY2017 Earnings Call downplaying the impact of competition on iRobot's sales, shelf space and market share were false and misleading because as set forth herein, contrary to Defendants' false reassurances, Individual Defendants knew at this time that these "competitive threats" were only growing and increasingly eroding iRobot's store shelf space, sales, and market share in 2018, rather than being adequately factored into the Company's revised guidance. In particular, Individual Defendants knew by this time in early 2018 that iRobot's U.S. market share was declining significantly as a result of this increasing competition. Accordingly, Defendants knew that iRobot was not "well equipped to win in 2018" based on its own internal market research, sales reports, and market share analyses showing that it was increasingly losing store shelf space, sales, and market share to Shark and other lower-priced competitors at this time. Indeed, Individual Defendants internally were greatly concerned about these adverse competition trends starting no later than late 2017 after the Shark ION's launch, and these concerns only grew at this time in early 2018, when they falsely reassured investors that these competition threats were under control.

119.    Further, Defendant Angle's reassurances that iRobot's increased "competitive pressure [] is embedded in the guidance that we've given" and "in the guidance that we gave, we allowed ourselves some amount of ability to respond to competitive threats" were additionally false and misleading because they created the false impression that such competitive threats were at that time adequately factored into iRobot's financial guidance—i.e., they were under control and would not further adversely impact iRobot's business. In reality, however, Defendants knew of, but failed to disclose, negative competitive trends (the declining store shelf space, sales, and market share, as described above) that were only getting worse at this time in early 2018, rather than improving—material facts that belied Angle's positive assurances that these competitive pressures would not further diminish iRobot's financial performance. In other words, this

increased new competition created significant new risks to iRobot's ability to meet its guidance that Defendants failed to disclose or downplayed. Accordingly, Defendant Angle's statements above lacked a reasonable basis when made.

120.    During the call, Defendants also reassured investors that iRobot was still seeing increasing demand for its premium-tier products that were critical to the Company's revenues and profitability. Specifically, in response to a question from a Dougherty & Company analyst, Defendant Angle falsely reassured investors that market pressure from increased competition was not negatively impacting iRobot's sales of its premium-tier Roombas such that the 60% premium-tier to 40% entry-level "mix" of Roomba sales would remain the same:

> Analyst: I mean, one of the drivers of growth this year has definitely been the mix up to your higher price point products and selling more in that category. Just wondering, when you look at the market, I think the mix has been running kind of 60% of your sales have been the 800 and the 900 SKUs and 40% in the lower SKUs. Just wondering when you look out next year and may be into 2019, do you think you can hold that 60-40 mix? Or do you think there is risk of giving some of that trade-up mix benefit that you've seen this year back?

> Angle: I don't think that – I mean, the real market pressure isn't giving it back. It's – we as aggressively as we can take our premium features and roll them down to ensure that our entry-level price points continue to be competitive and to ensure that we can hold off these lower tech entrants into the marketplace. And the – and so that – I think that the mix – we'll have to start to see how the year rolls out. It's – we modeled it similar. Although if there was going to be a deviation from prior year, it might actually be a shift up toward premium as the category continues to mature and the – and iRobot's strongest differentiation will always be at the premium level.

121.    Defendant Angle's statements and reassurances at the 4Q17 / FY2017 Earnings Call were materially false and misleading for the same reasons outlined above. In particular, Defendants' assurance that iRobot "can hold off these lower tech entrants" falsely minimized the competitive threat that these new competitors represented to iRobot's business given Defendants' knowledge of internal contradictory market research and analyses. As noted above, by this time, Defendants knew of, but failed to disclose, negative competitive trends (the declining store shelf space, sales, and market share) that were only getting worse at this time in early 2018, rather than

improving—material facts that belied Angle's positive assurances downplaying the impact of this new competition. Accordingly, Defendant Angle's statements above lacked a reasonable basis when made.

122.    The market continued to adopt Defendants' reassurances that iRobot's dominant competitive position remained intact despite increased competition. As PiperJaffray reported on February 8, 2018, "[a]lthough competition is creeping up, we believe the robotic vacuum market is beginning to inflect and iRobot still has very strong market share and will be able to leverage their higher performing products to continue to ride the wave of this industry." Likewise, Loup Ventures issued a report that same day explaining that "we remain believers in the long- term iRobot story." Likewise, Raymond James also upgraded iRobot's shares to "Outperform" the next day, expressing optimism in the Company's growth prospects "[d]espite competition."

**March 1, 2018 – 2018 Analyst Day**

123.    Defendants continued to downplay the impact of increased competition on iRobot's business and growth trajectory during the Company's 2018 Analyst Day presentation on March 1, 2018.

124.    For example, Defendant Cerda assured the public that increased competition was not influencing iRobot's leading global market share:

> [W]e are holding to our [global] segment share position around 62%. The names, right, the size of the [market share] bars, they change from 1 year to the other, right, and they come up with different strengths for the marketplace, but we feel quite good that '17 was still another year where we maintained our segment position.

125.    Additionally, Defendant Cerda assured the public that increased competition would not impact iRobot's gross margins, such that the Company could maintain its strong growth rates and profitability:

> [D]espite a competitive environment, we are not expecting to see gross margin degradation. We have a stack of initiatives that cover already 2 years into the future on how we are going to be bringing more and more operational efficiencies and cost takeout. That as competition comes in and we have to react, right, we hopefully -- that enables us to maintain both the growth and our profitability.

126. In addition to the reasons stated above, Defendant Cerda's statement at the 2018 Analyst Day "that "'17 was still another year where we maintained our segment position," even if literally true that iRobot did maintain its leading market share in the U.S. RVC segment, was nevertheless misleading, because Defendant Cerda knew, but failed to disclose, material adverse competitive trends, as demonstrated in iRobot's internal market research at the time,–that iRobot's market share was significantly declining by this time due to increased competition. By early 2018, the decline in iRobot's U.S. market share (due to the increased competition from Shark and the other competitors) began to be visible internally. Thus, Defendant Cerda's statement created the false impression that iRobot's market share in the RVC segment remained unaffected by increasing competition, when in reality it was already significantly declining.

127. Analysts reacted positively to Defendants' reassurances. For example, an analyst report by Raymond James issued on the same day stated that, after attending iRobot's Analyst Day event, these analysts "came away impressed with the quality of the presentations, an appreciation for the company's longer term ambitions, and further reinforcement that 2018 could prove to be a banner year despite its inauspicious start."

128. Similarly, PiperJaffray reported the next day that "we are confident management is making important strategic decisions in an increasingly competitive atmosphere to turn operating expenses into significant revenue growth with expanded market exposure and maintaining market share." The PiperJaffray report further explained that the increasing numbers of new competitors "should not stunt top line revenue growth" because "[these competitors] are in turn helping iRobot by increasing awareness of robotic vacuums to new market segments."

129. Additionally, just a few days later, on March 6, 2018, Sidoti & Company wrote a report that maintained its "BUY" rating, stating that despite new competition, "we think iRobot's premium brand status will allow the company to maintain its market-leading position."

**April 25, 2018 – 1Q18 Earnings Call**

130. On April 25, 2018, during the Company's 1Q18 earnings call, in response to an analyst question about "how Roomba at the different price points is positioned versus the

competition feature-wise," Defendant Angle again misleadingly downplayed the impact of competition on iRobot's sales: "These other robots are relatively new on the market and so, they try to go and copy some of our features as best they can. I think that in Q4, we had tremendous success against the competition. Our robots are designed with a system and many features working together to deliver superior performance."

131.    Defendant Angle's statements at the 1Q18 Earnings Call downplaying the impact of competition on iRobot's business were knowingly false and materially misled investors for the same reasons set forth in above. In particular, Angle's statement that iRobot had "tremendous success against the competition" in the fourth quarter of 2017, was false and misleading because it omitted known adverse competitive trends that contradicted Angle's positive assertion (iRobot's declining store shelf space and sales as a result of increased competition) which were already readily apparent internally in the fall of 2017. Accordingly, Defendant Angle's statement above lacked a reasonable basis when made. Moreover, Defendant Angle's statement created an impression of a state of affairs at iRobot—that its dominant competitive position remained unaffected by these growing competitive threats—that differed in a material way from the internal reality.

132.    Market analysts were reassured by Defendants' statements regarding competition. In fact, Loup Ventures stated that same day that "we were encouraged to hear Management's commentary around continued strength despite investor fears of increased competition." That same day, PiperJaffray similarly reported that "[d]espite competitive headwinds iRobot remains head and shoulders above competition due to their strong brand recognition and technology competitive advantage."

**July 25, 2018 – 2Q18 Earnings Call**

133.    On July 25, 2018, iRobot held an earnings call with analysts to discuss the Company's results for 2Q18. As noted above, Defendants addressed the pending threat of tariffs and suggested that iRobot may need to increase product prices to offset the costs of tariffs. Defendants, however, continued to downplay the impact of competition on iRobot's business,

particularly, at the entry-level tier. Specifically, in response to analyst questions about the high price point of iRobot's products and the premium-tier 900 series Roombas in particular, Defendant Dean assured investors that increased lower-cost competition was not impacting iRobot's continued strong demand for both its premium and entry-level tier products:

> Analyst: I can see why consumers would choose a 600 series given the price point, but why are you finding that consumers are going all the way up to the 900, given the price point? I mean, it's much more expensive than the middle series. What does your research say, that somebody will choose that 900 series over the 800 series? I know it's got more bells and whistles and stuff, but it seems like it's incrementally more to the consumer.
>
> Dean: So Frank, in my comments, that mix between 900 and 600 really has been consistent with what we've seen the last several quarters, so as we've talked about for a while, we see a strong amount of demand at the 900 end and the 600 end, and that is -- been very consistent over the last couple of quarters, so there was nothing really new in how that revenue split between those two models.

134.    Defendant Angle then followed up on Defendant Dean's response, similarly representing that iRobot continued to see strong sales and demand for both its premium-tier and entry-level products and that iRobot thus could stay competitive at the "low end" without sacrificing profits, despite this increased cheaper, lower-end competition:

> Angle: I think, to put a little color, the Prime Day success demonstrated continued strength down at the entry-level price points, which I think is very material in that we are not simply getting pushed into premium only, we continue to have strong performance across price points, and I think that that's a very material result and probably the most important message coming out of Prime Day.
>
> Analyst: Got it. And that, in fact, you can obviously be competitive at that low end and still maintain margins, right?
>
> Angle: Correct.

135.    Later during this earnings call, Defendant Angle again downplayed the increased competition as not causing any significant "new disruptions" on iRobot's business, based on the Company's purportedly continued strong sales for both its premium-tier and entry-level products:

Analyst: So Colin, on the last call you mentioned more Chinese competitors coming into the shelves in Europe, and mentioned that that could potentially happen in the U.S. this year. Reading your comments today, maybe I'm just reading too much into it, but when you talk about the competitive environment looking similar to last year, to me that sounds a bit more optimistic than last call. First of all, am I reading that right, and if so, can you just talk about what has changed?

Angle: I think that we certainly saw an influx of new competitors in Q4, and it did change the dynamics in the marketplace somewhat. We've seen that stabilize through the first half, and I think that, again, you look at Prime Day as an exemplar of, okay, there is significant availability of these low-end models. How much share did they take, how much did they disrupt, and what did they do in Prime Day. And the results are very favorable relative to iRobot demonstrating its ability to maintain strong performance at the low end of the marketplace while we maintain our strong performance at the high end. And so that I think that there's a very good indication that, yes, the market was somewhat disrupted at the end of Q4, that the market growth rates certainly allowed for them to enter without substantially impacting the performance we had predicted and laid out, and the environment, while certainly very competitive, is not demonstrating new disruptions.

136. However, Defendants' statements during the 2Q18 Earnings Call, were false and misleading because, increased cheaper competition was already substantially, adversely impacting iRobot's sales and financial performance, causing significant "new disruptions" to its competitive position, and particularly diminishing demand for and sales of iRobot's entry-level products. As described above, Defendants knew that by this time, iRobot thus did not have "continued strength down at the entry-level price points," "strong performance across price points," or "strong performance at the low end of the marketplace while we maintain our strong performance at the high end." To the contrary, at this time in mid-2018, increased cheaper competition from Shark, Neato, and others, was saturating the lower-end market and increasingly chipping away at iRobot's store shelf space, sales, and market share, particularly hurting sales of iRobot's lower-end entry-level products. In the summer of 2018, internally iRobot was already beginning to shift its sales and marketing efforts exclusively to the premium-tier, effectively ceding the entry-level market to its lower-end competition. Yet publicly, Defendants continued to falsely tout iRobot's purportedly strong demand and sales at the entry-level tier as unaffected by this cheaper competition.

137.    Moreover, Defendant Angle's statements that iRobot saw "a strong amount of demand at the 900 end and the 600 end, and that is -- been very consistent over the last couple of quarters" and that "iRobot [was] demonstrating its ability to maintain strong performance at the low end of the marketplace while we maintain our strong performance at the high end" were additionally false and misleading because he was aware of, but failed to disclose, that increased lower-end competition had by this time significantly reduced iRobot's sales, particularly at the entry-level tier, where the market was significantly more saturated with competition, as demonstrated internally in the weekly Field Marketing Reports sent to iRobot corporate and discussed on weekly sales calls between iRobot sales personnel and CCS. Critically, the entry-level product income stream represented 40% of the Company's Roomba revenues. But, as noted above, at this time in the summer of 2018, internally iRobot was already beginning to shift its sales and marketing efforts exclusively to the premium-tier, effectively ceding the entry-level market to its lower-end competition and thus giving up this crucial income stream. Accordingly, contrary to Defendant Angle's statement, iRobot was in fact "getting pushed into premium only."

138.    Additionally, Defendants' statements touting iRobot's performance on Amazon Prime Day were also false and misleading because they gave investors the false impression that iRobot's performance on Prime Day was representative of the Company's overall sales. In reality, iRobot heavily discounted the prices of Roombas sold on Amazon.com that day as part of the Prime Day promotion, thereby generating numerous additional sales that did not occur in the ordinary course due to the normally high prices of these products. Accordingly, iRobot's sales performance on Prime Day was artificially inflated by these substantial price discounts and not indicative of its typical sales.

139.    Analysts continued to rely on Defendants' positive statements minimizing the impact of competition, particularly highlighting the ostensible protection provided by iRobot's premium-tier strategy. For example, that same day, J.P. Morgan reported that "[c]ommentary regarding competition seems more optimistic." Similarly, Loup Ventures also issued a report on that day, stating that they remained convinced that "concerns around competition continue to be

overblown, and the company has established an untouched niche in the high-end robovac category."

**September 13, 2018 – Morgan Stanley Laguna Conference**

140.    On September 13, 2018, at the Morgan Stanley Laguna Conference, Defendant Dean continued to downplay the impact of tariffs on iRobot's business and competitive position. Specifically, in response to a question from a Morgan Stanley analyst about whether the "elephant in the room being trade [i.e., tariffs]" was impacting iRobot's business, Defendant Dean reassured investors that "[i]t's not impacting our business to date."

141.    Defendant Angle's statement at the September 13, 2018 Morgan Stanley Laguna Conference that tariffs were "not impacting our business to date" was false and misleading or omitted material facts when made because, as discussed above, iRobot was building up its U.S. inventory in 2Q18—as a way of mitigating some of the financial impact from the tariffs, because as described above—its sales were also softening (as a result of increased competition). Furthermore, Defendants knew that tariffs would result in price increases on iRobot's already higher priced products, thereby further diminishing demand for the Company's products, sales of which were already waning due to increased lower-cost competition. Therefore, Defendants knew, but concealed from investors, that the tariffs would only exacerbate the adverse impact of competition on iRobot's demand and sales. It was known internally at iRobot during this time that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that competition was putting "price pressure" on iRobot.

**October 24, 2018 – 3Q18 Earnings Call**

142.    On October 24, 2018, after the 10% tariffs went into effect in September of 2018, iRobot held an earnings call to discuss iRobot's results for the 3Q18, announcing, inter alia, that the Company now expected the tariffs to have a negative impact of $5 million on the Company's full-year 2018 operating income expectation. During the call, Defendant Angle further explained that "[t]he imposition of 10% tariffs went into effect on September 24 and we made the decision not to pass those additional costs to U.S. retailers or consumers in 2018. And as a result, we expect

lower gross margin in Q4 resulting from the tariffs with full year gross margin of approximately 50%."

143.     During the call, Defendants further suggested that although at that point iRobot was still absorbing the costs of the tariffs, rather than passing them on to consumers through product price increases, the latter option was nevertheless a possibility in 2019 to mitigate the impact of tariffs. Defendant Angle then misleadingly reassured investors that any such future tariffs-related product price increases would not significantly affect iRobot's competitive position. Specifically, he represented that the tariffs would impact its competitors much more than iRobot and would not continue to impact the Company in the long-term, because the low end of the market, as opposed to the high end where the Company was positioned due to its premium-tier strategy, was more likely to be sensitive to tariff-related product price increases:

> Let me add another just sort of high-level color as we think about tariffs. The first is that, as evidenced by our continuing strong growth, this is a very healthy market so that many of our growth expectations, as we talked about them, are well below the market growth so that there is some ability to absorb an impact without putting us in a dangerous situation. And so, really this is about competitive positioning within this growing market. . . iRobot is the premium player and that's very advantageous because price sensitivity at the high end is much lower than at the bottom end. And so that we're well positioned as we think about whether or not what exactly the mix of margin and price increases will be our optimal strategy.

> . . .

> A tariff would impact most directly price points below which we play, where if you're a value player, a price increase has a very material impact on growth. But further up, the value -- the price change, your premium customer is less price sensitive But again, this is not a world end kind of situation. This is something that will affect all competitors. And in a very real way, we are better positioned than our major competitors [that] play at the low end to maintain an aggressive stance.

144.     Further, in response to follow-up questions from an analyst about potential tariff-related product price increases in the future, Defendant Angle reiterated that, based on the Company's supposedly extensive "interim research" on price elasticity (i.e., price sensitivity), such

a tariff-related price increase would hurt its lower-end competitors more than iRobot given the Company's premium-tier focus:

> Analyst: And then one last question for me and kind of a follow-up on Mike's. Have you done any work on price elasticity? And a 5% or 10% increase on pricing, what do you think that will do to kind of the growth rates?

> Angle: Yes, we have done a lot of interim research on price elasticity. And I think that I tried to give as much color as we're able to give on the call saying that the – it's good to be a premium retailer or a premier manufacturer. There is certainly more flexibility at the top than at the bottom, and again, we've got very good models as to how to craft our strategy next year.

145.    However, in addition to the reasons set forth above, Defendants' statements at the 3Q18 Earnings Call, minimizing the impact of tariffs on iRobot's competitive position, were false and misleading because they failed to tell investors that iRobot's so-called "optimal strategy" for dealing with tariffs included the Company effectively abandoning sales and marketing efforts for its entry-level products, which accounted for 40% of iRobot's Roomba revenue, due to increased competition. Further, the optimal strategy's success was contingent on consumers' willingness to pay even higher prices for iRobot's premium-tier products, which Defendants falsely insisted consumers would do because purportedly "price sensitivity at the high end is much lower than at the bottom end." Critically, however, Defendants knew that demand for iRobot's lower-end and premium-tier products was only further declining in 2018 due to increased cheaper competition, and that consumers were in fact reluctant to pay even higher prices for iRobot's already highpriced premium-tier models, rendering these models cost-prohibitive.

146.    Indeed, as set forth above, Defendants knew that because of the availability of competition with similar performance and features as iRobot's premium-tier Roombas, consumers were hesitant to pay the high prices for iRobot's premium tier products, many of which also had performance issues. Unlike the lower-priced entry-level products, iRobot's higher-end products could not supply the gasoline to keep the engine of iRobot sales running. At this time, iRobot's premium-tier Roombas, like the i7, were selling poorly following their release (in September

2018), due to their high price point and numerous software and performance issues. In fact, Defendants knew, but failed to disclose, that by this time iRobot's U.S. market share had declined substantially, by 10%, from the fall of 2017, as a result of the increased new competition in the RVC market. Thus, Defendants' statements lacked a reasonable basis when made.

147.   It was known internally at iRobot that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that competition was putting "price pressure" on iRobot. Thus, Defendants' statements above misleadingly concealed that the tariffs, by forcing iRobot to increase product pricing, would only further compound iRobot's already substantial competition problem—i.e., the Company's waning product demand and sales due to increased competition, which Defendants continued to downplay.

148.   Similarly, Defendants' statements that the Company was "better positioned" because it was a "premium player" and "premium customer is less price sensitive" were false and misleading because they gave the investors the false impression that demand for iRobot's premium-tier products (such as the i7 and i7+) remained strong, when in fact Defendants knew that the i7 line was selling poorly at this time. Indeed, as set forth above, at this time iRobot was becoming increasingly "desperate" to sell these models. Accordingly, Defendants lacked a reasonable basis for and omitted these key material facts, which rendered their positive statements about the purported benefits of iRobot's focus on the premium-tier products false and misleading given iRobot's price sensitivity.

149.   Analysts accepted Defendants' false and misleading statements. For example, on October 24, 2018, Sidoti & Company reported: "Given what appears to be strong demand for IRBT products and continued strength with the US dollar, we think that the tariffs could be largely offset." The next day, Dougherty & Company also noted Defendants' misstatements about price sensitivity favoring iRobot over its low-end competitors, writing that "management emphasized that as a premium brand they believe there will be less cost sensitivity vs. low end competitors."

**December 5, 2018 – Raymond James Technology Investors Conference**

150.     During the Raymond James Technology Investors Conference on December 5, 2018, Defendants continued to reassure investors of iRobot's strong competitive position despite increasing competition. Specifically, while Defendant Dean acknowledged that "over the last several years, we've had more competition coming in from what we call our entry price points or the low end of our range," she then misleadingly downplayed the impact of such increased competition on iRobot's market share: "our innovations have really resonated with the consumer base and we've been able to maintain the share despite the fact that these new entrants are coming in."

151.     In addition to the reasons stated above, Defendant Dean's statement at the December 5, 2018 Raymond James Technology Investors Conference downplaying the impact of competition on iRobot's market share was false and misleading because it created the false impression that iRobot's leading U.S. market share remained unaffected by increasing competition. In reality, however, by this time, iRobot knew that its U.S. market share had declined substantially, as a result of increased competition. By the time the Champion Program was implemented in October 2018, iRobot's market share had fallen an additional 10%, to 77%, which was characterized as a significant loss, due to the increased competition from Shark and the other competitors. Thus, even if Dean's statement that iRobot had "been able to maintain" its leading market share position were literally true, it was misleading by omitting these material adverse facts regarding iRobot's declining market share (and other adverse competitive trends, such as declining store shelf space and sales) and creating a false impression that increased competition was not negatively affecting iRobot's business.

**February 7, 2019 – 4Q18 / FY2018 Earnings Call**

152.     On February 6, 2019, after the market closed, iRobot issued its annual guidance for FY2019 and updated three-year financial targets, "including tariff impact." The Company's revenue guidance, in particular, exceeded analyst expectations given increased tariff concerns.

153.     On February 7, 2019, during the 4Q18 / FY2018 earnings call with analysts, Defendant Dean stated that iRobot's newly issued FY2019 guidance included an anticipated "$20

45

million to $25 million of tariff costs to be incurred in 2019." Dean also explained that the recent price increase on the i7 and i7+ were done to offset the impact of the 10% tariff and that if the tariffs were increased to 25% on March 1, 2019 (when the tariff "cease-fire" expired) iRobot would "likely increase our prices again to offset the incremental tariff costs incurred." Defendant Dean clarified that the $20 to 25 million was the "check we will write to pay for the tariffs." Defendant Dean, however, also asserted that the tariff-related "price increases [on the i7 and i7+] mostly offset that incremental $20 million to $25 million of tariff costs that we'll incur."

154.    In addition to the reasons above, Defendants' statements at the 4Q18 / FY2018 Earnings Call, minimizing the impact of tariffs on iRobot's competitive position and claiming that price increases on the i7 and i7+ Roombas would mitigate the impact of tariffs, were false and misleading because Defendants failed to tell investors that iRobot's strategy for dealing with tariffs included the Company effectively abandoning sales and marketing efforts for its entry-level products due to increased competition and that the strategy's success was contingent on consumers' willingness to pay even higher prices for iRobot's premium tier products. Critically, however, as discussed above, Defendants knew that consumers were reluctant to pay the already high prices for iRobot's premium-tier Roombas due to lower-priced competition, and that the tariff-related price increases only exacerbated this problem.

155.    During the February 7, 2019 earnings call, Defendants also continued to tout the Company's purportedly strong market share and sales of premium-tier Roombas to investors and downplay the impact of competition on the Company's business, even going so far as stating that the competition was not taking shelf space from the Company. Specifically, Defendant Angle stated: "In the U.S. we continue to see new competitive products selling through Amazon marketplace, but not on shelves of retailers, where we still generate 60% of our domestic revenue."

156.    In addition to the reasons stated above, Defendant Angle's statement that iRobot was not seeing "new competitive products selling. . .on shelves of retailers" was patently false and misleading because in 2018 iRobot was increasingly losing shelf space to competition in some of its most important big box retail stores, including Best Buy, Bed Bath and Beyond, Walmart,

Loew's and Target. Specifically, as set forth above, in 2018 iRobot continued to lose increasingly more shelf space to its competitors than it already had in 2017.

157.    Significantly, during the call, Defendant Angle also misrepresented iRobot's U.S. market share decline as of that time, asserting that it was only 3% and that thus iRobot's competitive position remained strong: "Our U.S. estimates for 2018 show a 3 point share loss overall, but we firmly believe that with low household penetration providing an opportunity for substantial category growth, we are well positioned to continue our growth trajectory in this market."

158.    However, in addition to the reasons set forth above, Defendant Angle's statement was false and misleading because it misrepresented the actual loss of market share iRobot was experiencing at that time. By approximately this time, iRobot had lost approximately 10% of its market share due to increased competition—more than triple the 3% figure provided by Angle. Moreover, iRobot's store shelf space, demand, and sales continued to be eroded by increased cheaper competition, which had saturated the RVC market, at this time, such that iRobot was not "well-positioned to continue" its prior strong growth in this market given these undisclosed adverse competitive trends.

159.    Additionally, Angle's assertion that the Company remained "well positioned" to maintain this strong growth based on the purported low household penetration in the RVC market was also false and misleading because, by this time, Defendants knew that the RVC market was not in fact growing as Angle suggested here. No later than early 2018, Individual Defendants knew that many Roomba consumers were repeat customers, rather than new customers that would grow the size of the overall RVC market—thus, iRobot was not penetrating into new households, the sole basis for Angle's reassuring statement. Likewise, Defendant Angle lacked a reasonable basis for and omitted these key material facts, which rendered his positive statement about iRobot's continued strong growth trajectory materially misleading.

160.    Analysts were again reassured by Defendants' statements about the continued strong demand for iRobot's premium-tier products and that the Company's FY2019 guidance was

not impacted by increased competition or the overhang of tariffs. For example, a February 7, 2019 PiperJaffray report stated: "Our previous concerns regarding tariffs and the implication to iRobot's 2019 guidance ended up being a non-event with overall sector demand more than offsetting this headwind. iRobot's execution in this market with increasing competition speaks to the company's superior brand." Likewise, that same day, J.P. Morgan wrote that "[w]e believe the outlook is better than investors had feared, particularly given the uncertainty heading into the print regarding the impact from tariffs."

**April 24, 2019 – 1Q19 Earnings Call and Partial Disclosure**

161.    The Company discussed its 1Q19 results on its earnings call on April 24, 2019. As discussed above, on that date, Defendants announced 1Q19 revenues and revenue growth that were significantly below analyst expectations, reflecting significantly decreased demand for iRobot's products. At the same time, however, Defendant Angle reassured investors that sales remained sufficiently strong for the Company to achieve its prior full-year guidance issued in February 2019, which he reaffirmed: "Q1 sell-through was good, setting us up for the higher year-over-year Q2 2019 revenue growth rate we discussed last quarter. Given our Q1 results and our outlook for the rest of the year, we are reaffirming our 2019 full year revenue and operating income expectations then increasing our full year expectations for earnings per share."

162.    In response to a question from an analyst about whether iRobot's premium-tier products were experiencing any lack of demand or if customers were buying more of iRobot's entry-level products, Defendant Dean touted the purported success of the Company's premium-tier models:

> Analyst: Okay. And on the product mix this quarter, I know in past quarters you've had a bit of a barbell effect in terms of the 600 series and some of the newer models. Was that the case this quarter with the other end of the barbell being the newer models?
>
> Dean: Yes. This quarter, we saw a little bit greater than 50% of our revenue coming from the 900 series and above, with the remainder coming below that. So really good traction to-date with the higher-priced [models].

163.     Finally, Defendant Angle assured investors that iRobot's tariff-related price increases on the premium-tier i7 and i7+ Roombas did not diminish demand for these products, which remained healthy: "[W]e increased on the i7 and i7+ at the beginning of the year to partially offset the impact of tariffs. Despite the higher prices, Q1 demand was ahead of plan for this product."

164.     The Individual Defendants' statements above were false and misleading or omitted material facts when made because Defendants' statements about the continued strong sales and demand for iRobot's premium Roombas, despite the tariff-related price increases, were false and misleading for the same reasons as set forth above.  Moreover, as set forth above, by the beginning of 2019, iRobot knew that iRobot's price increases were not mitigating the impact of tariffs and that the tariffs were in fact heavily impacting sale of iRobot products and market share in light of increased competition with comparable features at a lower price. Additional pressure of tariffs was negatively impacting iRobot's sales and market share and that that competition was putting "price pressure" on iRobot. Likewise, in early 2019, tariffs and competition (specifically, Shark) began to heavily impact sales of iRobot's products.

165.     In addition to the reasons stated above, Defendant Angle and Dean's reassurances of continued strong sales of and demand for iRobot's premium-tier i7 Roombas despite the increased prices due to tariffs, were false and misleading because Defendants knew that, by forcing iRobot to further increase the prices of its already expensive products, tariffs had only exacerbated the Company's sales struggles due to increased competition, which had already exerted substantial price pressure on iRobot.

166.     The Individual Defendants' reassurances continued to have their intended effect on analysts. For example, in an April 24, 2019 report, J.P. Morgan was encouraged by Defendants' positive statements regarding continued strong demand for iRobot's products: "Encouragingly, demand for the i7/i7+ was ahead of [C]ompany expectations, despite the pricing increase implemented during the quarter due to tariffs." The next day, a PiperJaffray report similarly stated that "[w]e remain confident in the [C]ompany's execution as we believe robotic vacuum demand

will remain strong in 2019 and iRobot has a robust pipeline of new and soon to be launched products to leverage this industry uptick." On April 30, 2019, Loup Ventures also reported that "[w]hile we anticipate increased competition in all product categories, we believe iRobot's technology leadership and brand awareness will support continued market leadership," and that "[r]ising competition is a legitimate concern for iRobot, but the company continues to maintain and extend its lead."

## The Truth Gradually Emerges

### July 23, 2019 – 2Q19 Earnings Call and Partial Disclosure

167.    On July 23, 2019, iRobot's true declining competitive position and the failure of iRobot's premium-tier strategy as a way to mitigate the impact of tariffs on iRobot's business were partially revealed. On that day, after the market closed, iRobot surprised the market when it issued its earnings release for 2Q19, which cut its full-year earnings forecast due to "the direct and indirect impacts of the ongoing U.S.-China trade war." Specifically, iRobot reduced FY2019 revenue guidance from between $1.28 billion - $1.31 billion, to between $1.2 billion - $1.25 billion. The Company also considerably slashed its EPS guidance from between $3.15 and $3.40 to between $2.40 and $3.15.

168.    However, Individual Defendants continued to conceal and misrepresent the full extent of iRobot's problems as a result of increased lower-priced competition in the RVC market and the tariff-related product price increases, including expressly denying that such competition was eroding iRobot's leading market share. Specifically, during the 2Q19 earnings call the next day, Defendant Angle reassured investors "[t]he U.S. segment did not accelerate in the second quarter as we had expected, but we had maintained our segment share in this region and are not seeing any share erosion due to competition." Likewise, Defendant Dean assured investors: "[W]e've held our share based on the data we are seeing. The competition doesn't seem to have taken anything in the first half of the year."

169.    Additionally, in response to questions from analysts regarding the continued viability of iRobot's premium-tier products, Individual Defendants reiterated that iRobot's tariff-related price increases on its premium-tier Roombas were not negatively affecting sales:

> Analyst: Maybe a couple of quick ones here for Colin. So Colin, I think with -- to me, just with the tariffs here, it really forced the price of some of your vacuums above a $1,000, right? And I think that's been a threshold or a ceiling that you -- historically, you've may wanted to avoid. So I would just like to get your thought on just kind of growth in the industry in a sub $200 market? Are you still seeing that there with the -- obviously, there's been less price increases because of tariffs in the robot's category?

> Angle: So that -- I am certain that s9 will be doing very well despite the fact that they've broken that $1000 price barrier, which to me, is not that it's great to have higher prices, but definitely the demand and the features of those products are being successful and I could only dream and imagine what we'd be doing if we could have those robots below $1000.

170.    In addition to the reasons set forth above, the statements and reassurances made at the 2Q19 Earnings Call referring to the s9 and stating that "demand and the features of those products are being successful" were false and misleading because Individual Defendants knew that demand for iRobot's lower-end and premium-tier products was only further declining in 2018 and early 2019 due to increased cheaper competition, and that consumers were in fact reluctant to pay even higher prices for iRobot's already higherpriced premium-tier models, rendering these models cost-prohibitive. Indeed, as set forth above, Individual Defendants knew that because of the availability of competition with similar performance and features as iRobot's premium-tier Roombas, consumers were reluctant to pay the premium prices for iRobot's products, many of which also had performance issues. Unlike the lower-priced entry-level products, iRobot's higher-end products could not supply certain features. Indeed, as set forth above, the premium-tier i7 and s9 models that the Company released in late 2018 and May 2019, respectively, sold poorly after their release. In fact iRobot had trouble selling these i7 and s9 models in 2018-2019. Moreover, Individual Defendants knew that upcoming price increases on all of iRobot's products following an increase of import tariffs to 25% would only exacerbate the impact of increased competition on

iRobot's sales. It was known internally at iRobot that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that that competition was putting "price pressure" on iRobot. In early 2019, tariffs and competition (specifically, Shark) began to heavily impact sales of iRobot's products.

171.    Further, Defendant Angle's and Defendant Dean's statements above denying the negative impact of increased competition and tariffs on iRobot's market share (i.e., that iRobot "maintained our segment share in this region and are not seeing any share erosion due to competition" and that "[W]e've held our share based on the data we are seeing. The competition doesn't seem to have taken anything in the first half of the year.") were false and misleading for the reasons set forth above.

172.    Analysts were comforted by Defendants' false reassurances that iRobot's dominant competitive position remained unaffected by increased competition and tariff-related price increases. By way of example, on July 24, 2019, J.P. Morgan reported that the "[C]ompany believes that it is not losing market share, but rather the tariff-driven slowdown is impacting the overall [RVC] category."

173.    During after-market hours on April 23, 2019, the Company issued a press release reporting the Company's financial results for the first fiscal quarter of 2019. The press release disclosed lower than expected revenue for the quarter, as well as unusually high inventory levels of approximately $181 million, up from $112 million in April 2018. For the three months ended March 30, 2019, the press release reported DII of 140, up from DII of 101 for the three months ended March 31, 2018.

174.    On this news, the price of the Company's stock dropped from $130.57 per share at the close of trading on April 23, 2019, to $100.42 per share at the close of trading on April 24, 2019, on heavy volume, representing a loss in value of over 23%.

175.    During after-market hours on July 23, 2019, the Company issued a press release reporting the Company's financial results for the second fiscal quarter of 2019. The press release announced that the Company was cutting its 2019 full-year earnings forecast from a range of $1.28

billion – $1.31 billion, down to a range of $1.2 billion – $1.25 billion. The Company also cut its earnings per share guidance from a range of $3.15 – $3.40 per share down to $2.40 – $3.15 per share.

176.    On this news, the price of the Company's stock fell yet again, from $89.63 per share at the close of trading on July 23, 2019, to $74.51 per share at the close of trading on July 24, 2019, on heavy volume, representing a loss in value of nearly 17%.

177.    Finally, during after-market hours on October 22, 2019, the Company issued a press release reporting the Company's financial results for the third fiscal quarter of 2019. The press release revealed that the Company was cutting down the high end of the full-year 2019 earnings forecast the Company had previously reported, from $1.25 billion to $1.21 billion. Moreover, the Company's inventory levels had shot up once again to $248 million, or 149 DII, as compared to $161 million, or 113 DII during the third fiscal quarter of 2018. The press release attempted to blame the Company's decreased earnings guidance on a "suboptimal" customer response during the quarter, stating, "[a]lthough our third-quarter results were strong, sell-through following our late July price increases was suboptimal. Given this outcome and our belief that the RVC category was at a growth inflection point prior to tariffs, we elected to roll back our pricing to pre-tariff levels on most of our products."

178.    On this news, the price of iRobot shares dropped once more, from $54.03 per share at the close of trading on October 22, 2019, to $49.06 per share at the close of trading on October 23, 2019, representing a loss in value of over 9%.

<u>**Repurchases**</u>

179.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $49.9 million to repurchase approximately 798,794 shares of its own common stock at artificially inflated prices.

180.     According to the May 2018 10-Q, between February 25, 2018 and March 31, 2018, the Company purchased 30,000 shares of its common stock for approximately $1.92 million, at an average price of $64.32 per share.

181.     As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between February 25, 2018 and March 31, 2018 was approximately $457,800.

182.     According to the August 2018 10-Q, between April 1, 2018 and April 28, 2018, the Company purchased 309,333 shares of its common stock for approximately $19.5 million, at an average price of $63.35 per share.

183.     As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between April 1, 2018 and April 28, 2018 was approximately $4.42 million.

184.     According to the August 2018 10-Q, between April 29, 2018 and May 26, 2018, the Company purchased 357,367 shares of its common stock for approximately $21.8 million, at an average price of $61.06 per share.

185.     As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between April 29, 2018 and May 26, 2018 was approximately $4.28 million.

186.     According to the August 2018 10-Q, between May 27, 2018 and June 30, 2018, the Company purchased 102,094 shares of its common stock for approximately $6.63 million, at an average price of $65.03 per share

187.     As the Company's stock was actually worth only $49.06 per share, the price at closing on October 23, 2019, the amount the Company overpaid for repurchases of its own stock between May 27, 2018 and June 30, 2018 was approximately $1.63 million.

188.     In total, the Company overpaid an aggregate amount of approximately $10.7 million for repurchases of its own stock during the Relevant Period.

## DAMAGES TO IROBOT

189.    As a direct and proximate result of the Individual Defendants' conduct, iRobot will lose and expend many millions of dollars.

190.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

191.    Such losses include the Company's overpayment by over $10.7 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

192.    Additionally, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

193.    As a direct and proximate result of the Individual Defendants' conduct, iRobot has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations by the Individual Defendants and their breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

194.    Plaintiffs bring this action derivatively and for the benefit of iRobot to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act as well as the aiding and abetting thereof.

195.    iRobot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

196.    Plaintiffs are, and have been at all relevant times, shareholders of iRobot. Plaintiffs will adequately and fairly represent the interests of iRobot in enforcing and prosecuting its rights,

and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

197.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

198.    A pre-suit demand on the Board of iRobot is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Angle, Ali, Bell, Ellinger, Finney, Kao, Miller, and Stacy (the "Director-Defendants"), along with non-party Eva Manolis (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors who are on the Board at the time this action was commenced.

199.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the misconduct they engaged in to knowingly or recklessly cause the Company to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors, to make and/or cause the Company to make false and misleading statements and omissions of material fact while seven of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $10.7 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators.

200.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused the Company to make and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, nine of the Individual Defendants,

including seven of the Directors, sold Company stock at artificially inflated prices based on inside material information.

201.    As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

202.    Additional reasons that demand on Defendant Angle is futile follow. Defendant Angle is a co-founder of the Company, and currently serves as the Company's CEO and Chairman of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Angle with his principal occupation, and he receives handsome compensation, including $5,683,314 in 2018 for his services. Defendant Angle was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $18 million in proceeds, demonstrate his motive in facilitating and participating in the misconduct. Moreover, Defendant Angle is a defendant in the Securities Class Actions. For these reasons, Defendant Angle breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Ali is futile follow. Defendant Ali has served as a Company director since August 2015. He also serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Ali has received and continues to receive compensation for his role as a director as described above. As a trusted

Company director, he conducted little, if any, oversight of the scheme to cause the Company to cause the company to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors, to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $246,275 in proceeds, demonstrate his motive in facilitating and participating in the misconduct. Furthermore, Defendant Ali signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Ali breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Bell is futile follow. Defendant Bell has served as a Company director March 2016. He also serves as the Chair of the Company's Compensation and Talent Committee. Defendant Bell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to, to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors, to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded at least $458,233 in proceeds, demonstrates his motive in facilitating and participating in the misconduct. Furthermore, Defendant Bell signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Bell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Ellinger is futile follow. Defendant Ellinger has served as a Company director since November 2011. She also serves as the Chair of the Company's Nominating and Corporate Governance Committee. Defendant Ellinger has

received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors,  to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded at least $360,000 in proceeds, demonstrate her motive in facilitating and participating in the misconduct. Furthermore, Defendant Ellinger signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Ellinger breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

206.    Additional reasons that demand on Defendant Finney is futile follow. Defendant Finney has served as a Company director since January 2017. She also serves as a member of the Company's Audit Committee and Compensation and Talent Committee. Defendant Finney has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors, to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Finney signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Finney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant Kao is futile follow. Defendant Kao has served as a Company director since June 2018. He also serves as a member of the Company's Audit Committee. Defendant Kao has received and continues to receive compensation for his role

as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded at least $15,327 in proceeds, demonstrates his motive in facilitating and participating in the misconduct. Furthermore, Defendant Kao signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Kao breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since September 2016. He also serves as the Chair of the Company's Audit Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Miller has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to misstate the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors, to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $200,144 in proceeds, demonstrate his motive in facilitating and participating in the misconduct. Furthermore, Defendant Miller signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Stacy is futile follow. Defendant Stacy has served as a Company director since August 2014. She also serves as a member of the Company's Compensation and Talent Committee. Defendant Stacy has received and continues to

receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company misstate to the truth concerning the Company's declining competitive position, effect of tariffs, and that its products were overpriced relative to competitors and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded at least $512,130 in proceeds, demonstrate her motive in facilitating and participating in the misconduct. Furthermore, Defendant Stacy signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Stacy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

210.    Additional reasons that demand on the Board is futile follow. As described above, seven of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendants Angle, Ali, Bell, Ellinger, Kao, Miller, and Stacy collectively received proceeds of over $20 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

211.    Additionally, Defendants Angle, Ali, Bell, Ellinger, Finney, Kao, Miller, and Stacy, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $10.7 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

212.     Defendants Finney, Kao, and Miller (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

213.     The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

214.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

215.     iRobot has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for iRobot any part of the damages iRobot suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

216.    The Individual Defendants' conduct described herein and summarized above, including the decisions for the Company to engage in the repurchases of its own stock could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

217.    The acts complained of herein constitute violations of fiduciary duties owed by iRobot's officers and directors, and these acts are incapable of ratification.

218.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of iRobot. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of iRobot, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

219.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause iRobot to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

220.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and if not all of them, at least five of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

*Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934*

221.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

222.     The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

223.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

225.     Under the direction and watch of the Directors, the 2017, 2018, and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that  the Individual Defendants caused the Company to misstate the truth and omit facts concerning: (1) the impact of increased competition in the RVC market (and the extent of such impact) on iRobot's sales, store shelf space,

market share, and overall financial performance; (2) the Company's strategy to focus nearly all of its sales and marketing resources on its premium-tier Roombas at the expense of its entry-level models; (3) the impact of Chinese trade tariffs on its business, including the risks associated with the Company's premium-tier strategy in light of the tariffs and increasing price pressure from lower-cost competition (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

226.   Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the conduct to issue false and misleading statements and omissions of material fact.

227.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, appointment of an independent auditor, an advisory vote on executive compensation, an advisory vote on the frequency of executive compensation, approval of an employee stock purchase plan, approval of amendments to the Company's certificate of incorporation to eliminate supermajority voting requirements, to declassify the Board of Directors, and to eliminate the prohibition on shareholders' ability to call a special meeting, and, in the case of the 2018 Proxy Statement, approval of the 2018 Incentive Plan.

228.   The false and misleading elements of the Proxy Statements led to the approval of the 2018 Incentive Plan and to the re-election of Defendants Angle, Ali, Bell, Chwang, Ellinger, Finney, Kao, Miller, and Stacy, which allowed them to continue breaching their fiduciary duties to iRobot.

229.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

230.    Plaintiffs on behalf of iRobot have no adequate remedy at law.

## SECOND CLAIM

*Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5*
*of the Exchange Act*

231.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

232.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding iRobot. Not only is iRobot now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon iRobot by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 798,794 of its own shares at artificially-inflated prices, damaging iRobot.

233.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

234.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about iRobot not misleading.

235.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by iRobot. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

236.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

237.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
*Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act*

238.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

239.    The Individual Defendants, by virtue of their positions with iRobot and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of iRobot and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause iRobot and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

### FOURTH CLAIM

*Against the Individual Defendants for Breach of Fiduciary Duties*

240.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

241.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of iRobot's business and affairs.

242.     Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

243.     The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of iRobot.

244.     The Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

245.     In further breach of their fiduciary duties owed to iRobot, the Individual Defendants intentionally or recklessly wasted corporate assets on repurchases of the Company's own stock at artificially inflated prices, caused the Company to make false and misleading statements of material fact. Specifically, the Individual Defendants made and/or caused the Company to make false and misleading statements of material fact that failed to disclose: (1) the impact of increased competition in the RVC market (and the extent of such impact) on iRobot's sales, store shelf space, market share, and overall financial performance; (2) the Company's strategy to focus nearly all of its sales and marketing resources on its premium-tier Roombas at the expense of its entry-level models; (3) the impact of Chinese trade tariffs on its business, including the risks associated with the Company's premium-tier strategy in light of the tariffs and increasing price pressure from lower-cost competition (4) the Company failed to maintain internal controls. As a result of the foregoing, iRobot's public statements were materially false and misleading at all relevant times.

246.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

247.    In breach of their fiduciary duties, nine of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact.

248.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of iRobot's securities and disguising insider sales.

249.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly.

250.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

251.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, iRobot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**FIFTH CLAIM**

*Against the Individual Defendants for Unjust Enrichment*

252.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

253.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, iRobot.

254.    The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from iRobot that was tied to the performance or artificially inflated valuation of iRobot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

255.    Plaintiffs, as shareholders and a representative of iRobot, seek restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

256.    Plaintiffs on behalf of iRobot have no adequate remedy at law.

**SIXTH CLAIM**

*Against Individual Defendants for Abuse of Control*

257.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

258.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence iRobot, for which they are legally responsible.

259.    As a direct and proximate result of the Individual Defendants' abuse of control, iRobot has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, iRobot has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SEVENTH CLAIM
*Against Individual Defendants for Gross Mismanagement*

260.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

261.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of iRobot in a manner consistent with the operations of a publicly-held corporation.

262.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, iRobot has sustained and will continue to sustain significant damages.

263.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

264.    Plaintiffs on behalf of iRobot have no adequate remedy at law.

## EIGHTH CLAIM
*Against Individual Defendants for Waste of Corporate Assets*

265.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

266.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused iRobot to waste valuable corporate assets and to incur many millions of dollars of legal liability and costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

267.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

268.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

269.    Plaintiffs on behalf of iRobot have no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of iRobot, and that Plaintiffs are adequate representatives of the Company;

B.    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to iRobot;

C.    Determining and awarding to iRobot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Directing iRobot and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect iRobot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-laws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

i.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

    ii.   a provision to permit the shareholders of iRobot to nominate at least five candidates for election to the Board; and

    iii.   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E.    Awarding iRobot restitution from Individual Defendants, and each of them;

F.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 4, 2020                Respectfully submitted,

/s/ *Michael P. Utke*
Michael P. Utke (BBO #687171)
**LAW OFFICE OF MICHAEL P. UTKE, LLC**
P.O. Box 360
Pepperell, Massachusetts 01463
(617) 314-6600
mutke@utkelaw.com
Liaison Counsel for Plaintiffs

Gregory M. Egleston
Thomas J. McKenna
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue
New York, New York 10017
(212) 983-1300
gegleston@gme-law.com
tjmckenna@gme-law.com

74

Joshua Baker (BBO #695561)
Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
101 Greenwood Ave., Suite 440
Jenkintown, Pennsylvania 19046
(212) 686-1060
jbaker@rosenlegal.com
pkim@rosenlegal.com

Lead Counsel for Plaintiffs